COMMONWEALTH OF PENNSYL-
VANIA et al.,

v.

LOCAL UNION NO. 542, INTERNA-
TIONAL UNION OF OPERAT-
ING ENGINEERS et al.

Civ. A. No. 71–2698.

United States District Court,
E. D. Pennsylvania.

Aug. 4, 1972.

Harold I. Goodman, Andrew S. Price, Community Legal Services, Philadelphia, Pa., for class and named plaintiffs.

Thomas J. Oravetz, J. Shane Creamer, Atty. Gen., Harrisburg, Pa., for the Com. of Pennsylvania.

Abraham E. Freedman, Philadelphia, Pa., for Local 542.

Ralph B. Powell, Jr., Philadelphia, Pa., for General Bldg. Contractors Assn.

## OPINION

HIGGINBOTHAM, District Judge.

### I.

In Philadelphia 196 years ago, a prophetic national vision was uttered in the Declaration of Independence: "We hold these truths to be self evident, that all men are created equal . . .". Yet, when proclaimed, the vision was not being implemented for many persons[1] in

---

1. Dred Scott v. Sandford, 60 U.S.(19 How) 393, 409, 410, 15 L.Ed. 691 (1856) Chief Justice Taney, speaking for the Court, stated:

"We refer to these historical facts for the purpose of showing the fixed opinions concerning that race, [the Negro], upon which the statesmen of that day spoke and acted. It is necessary to do this in order to determine whether the general terms used in the Constitution of the United States, as to the rights of man and the rights of the people, was intended to include them, or to give to them or their posterity the benefit of any of its provisions. The language of the Declaration of Independence is equally conclusive.

\* \* \* \* \*

"The general words above quoted [we hold these truths to be self evident, that all men are created equal] would seem to embrace the whole human family, and if they were used in a similar instrument at this day, would be so understood. But it is too clear for dispute, that the enslaved African race were not intended to be included, and form no part of the people who framed

and adopted this Declaration; for if the language as understood in that day would embrace them, the conduct of the distinguished men who framed the Declaration of Independence would have been utterly and flagrantly inconsistent with the principles they asserted; and instead of the sympathy of mankind, to which they so confidently appealed, they would have deserved and received universal rebuke and reprobation."

For the significance of the Dred Scott case to the Thirteenth Amendment, see Part VII–D, infra. See also speech of the distinguished black abolitionist, Frederick Douglass, The Meaning of July Fourth For The Negro, (July, 1852):

"Are the great principles of political freedom and of natural justice, embodied in that Declaration of Independence, extended to us? . . . I say it with a sad sense of the disparity between us. I am not included within the pale of this glorious anniversary! Your high independence only reveals the immeasurable distance between us. The blessings in which you, this day, rejoice, are not enjoyed

the new nation, since nearly one-fifth of the population was held in the chains of slavery.[2] Non-property owners seldom had the power to vote, and women were generally excluded from direct participation in the political process.[3] Through the subsequent corridors of history extraordinary strides have been made towards expanding liberty, justice and equality. For labor, blacks, the weak and the poor have had many doors open since 1776.[4] But the task of securing full equality for some of our citizens is still an urgent and unfinished business. As recently as 1964, the Congress of the United States emphasized that:

"In various regions of the country there is discrimination against some minority groups. Most glaring, however, is the discrimination against Negroes which exist throughout our Nation. Today, more than 100 years after their formal emancipation, Negroes who make up over 10 percent of our population, are by virtue of one or another type of discrimination not accorded the rights, privileges, and opportunities which are considered to be, and must be, the birthright of all citizens."[5]

The instant petition for an injunction *pendente lite* and a protective order is directly related to the expansion of rights which were assured by Congress in Title VII (Equal Employment Opportunity) of the Civil Rights Act of 1964. 80 Stat. 662, as amended, 86 Stat. 103, 42 U.S.C. § 2000e et seq. So far as the present emergency motion for an injunction *pendente lite*, the instant case is also a tragic reflection of a partial failure in the twentieth century to make real for all Americans the elusive rhetoric in the Declaration of Independence and the more precise rights guaranteed by the Civil Rights Acts of 1964 and 1972.

The instant case involved two interrelated phases or, as some might describe it, a lawsuit within a lawsuit. The first phase involves a lawsuit filed on November 8, 1971 and the second phase a petition filed on June 21, 1972,[6] which

in common.—The rich inheritance of justice, liberty, prosperity and independence, bequeathed by your fathers, is shared by you, not by me. The sunlight that brought light and healing to you, has brought stripes and death to me. This Fourth July is *yours*, not *mine*. *You* may rejoice, *I* must mourn. To drag a man in fetters into the grand illuminated temple of liberty, and call upon him to join you in joyous anthems, were inhuman mockery and sacrilegious irony . . .

" . . . Would you have me argue that man is entitled to liberty? That he is the rightful owner of his own body? You have already declared it. Must I argue the wrongfulness of slavery?"

II, P. Foner, The Life and Writings of Frederick Douglass, 188–189, 191, (1952).

2. D. Robinson, Slavery in the Structure of American Politics, 1765–1820, 98 (1931). For a general background as to slavery, *see* J. Franklin, From Slavery to Freedom, a History of Negro Americans, 3rd Ed. (1969), Chapters 4 through 16; B. Quarles, The Negro in the Making of America, rev. ed. (1969), Chapters 1 through 5; J. Green, The Negro in Colonial New England, 1620–1776 (1942);

W. Jordan, White Over Black: American Attitudes Towards the Negro, 1500–1812 (1968); B. Quarles, The Negro in the American Revolution, (1961); K. Stampp, The Peculiar Institution, (1956).

3. "No State permitted women or slaves to vote. In 1790 five states granted the right to vote to all men who paid taxes . . . eight states imposed property qualifications for the suffrage." H. Bradley, The United States, 1492–1877, 200 (1971).

4. See notes 41–48, p. 294, *infra*.

5. II U.S.Cong. & Adm.News, page 2393, (1964); See generally, H.R.Rep. No. 914, 88 Cong., 1st Sess. (1963). *See* Sen.Rep. No. 872, 88 Cong., 2d Sess.2d (1964); Sen.Rep.No. 92–415, 92 Cong., 1st Sess. (1971); Sen.Con.Rep. 92–681, 92 Cong., 2d Sess. (1972); H.R.Rep.No. 92–238, 92 Cong., 1st Sess. (1971); H.R.Con. Rep.No. 92–899, 92 Cong., 2d Sess. (1972)

6. On June 20, 1972, Harold I. Goodman, Esquire, counsel for plaintiffs, phoned my office and stated verbally that some named and class plaintiffs were being subjected to violence at the Union office. He requested an immediate hearing because of two violent incidents which had occurred, one of which occurred that morn-

claims that the defendant union and some of their members and agents are pursuing a course of conduct designed to intimidate, harass and preclude named and class plaintiffs from pursuing the lawsuit of November 8, 1971.

The first suit, filed on November 8, 1971, was initiated by the Commonwealth of Pennsylvania as a plaintiff, through the Attorney General of Pennsylvania, and twelve named individuals as plaintiffs and also as a class action on behalf of all others similarly situated. The causes of action are predicated on 42 U.S.C. §§ 1981, 1982, 1983, 1985(3), 1988,[7] and 2000d and 2000e et seq.

Federal jurisdiction was based, *inter alia*, on 42 U.S.C. § 2000e–5(f) and (g), 28 U.S.C. §§ 1331, 1343(3) and (4).[8]

The first phase of the suit alleges employment discrimination by Local 542, International Union of Operating Engineers, and all contractors and contractor associations who have negotiated or are subject to collective bargaining agreements negotiated with Local Union 542.

On March 13, 1972 I entered an Order granting plaintiffs' motions (1) for leave to maintain this action as a class action as to class plaintiffs under Rule 23(b)(2) of the Federal Rules of Civil Procedure, (2) for leave to maintain this action as a class action as to class defendants under Rule 23(b)(2) and, (3) denied defendants motions to dismiss certain party plaintiffs, to drop the Commonwealth of Pennsylvania as a plaintiff, to strike certain matters from the complaint, and to strike certain matters from the prayer for relief. Further, I reserved jurisdiction to modify the order as to the scope of the class action.

Until June 9, 1972, this law suit proceeded in a normal, though vigorously contested fashion. I have not made, nor do I now make, any findings as to whether there is any legal merit in plaintiffs' original charges of racial discrimination as alleged in their November, 1971 complaint. The sole issue now before me is whether there is merit in plaintiffs' June 21, 1972 petition for an injunction *pendente lite* on the ground that the union and some of its members, officers, and agents are pursuing a course of violence, harassment and other similar acts to intimidate plaintiffs from pursuing the original law suit and from seeking the relief claimed therein.

After careful consideration of the extensive, and often intense, arguments of counsel, the records and briefs, I conclude that:

■ (1) plaintiffs have clearly met their burden of proof[9] in establishing

ing. Since I had been available to counsel on several prior occasions for immediate consultation on matters pertaining to their disagreements at depositions. I felt that when there was a complaint of violence there should also be immediate access to the Federal Court. Thus, the proceedings started in the late afternoon of June 20th; after having heard testimony of one witness, it was continued to the following day so that plaintiffs could file a written petition and memorandum of law. N.T. 3–7 and 33–34. *See* Doc. No. 74, filed on June 21, 1972.

7. *See* Appendix A [deleted from published opinion] for the aforementioned statutes.

8. *Id.*

9. Citing only United Mine Workers of America v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), counsel for the Union presses the application of the "clear proof" standard provided in §

6 of the Norris-LaGuardia Act, 29 U.S.C. § 106. *See also,* Ramsey v. United Mine Workers of America, 401 U.S. 302, 91 S.Ct. 658, 28 L.Ed.2d 64 (1971); United Brotherhood of Carpenters v. United States, 330 U.S. 395, 67 S.Ct. 775, 91 L.Ed. 973 (1947).

It should be noted, however, that in civil actions under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, et seq., Congress has expressly provided in 42 U.S.C. § 2000e–5(h) that § 6 of the Norris-LaGuardia Act, 29 U.S.C. § 106, "shall not apply with respect to civil actions brought under this section [Title VII of the Civil Rights Act]." Accordingly, as to my findings (p. 273, *infra.*) the "clear proof" standard is not required by law. However, I find that nevertheless, plaintiffs have proven all of the findings, *infra,* by a standard which equals the "clear proof" requisite of 29 U.S.C. § 106.

that through some of its members, officers and agents, the union has conspired to harass, to intimidate, and to commit acts of violence with the intent to deter plaintiffs from pursuing the November 8, 1971 law suit; and

▆ (2) this Court has jurisdiction to grant an injunction *pendente lite* because of those acts of intimidation and violence designed to discourage plaintiffs from pursuing their November 8, 1971 law suit.

(3) During the course of the injunction *pendente lite* hearings there was no evidence introduced to connect even inferentially the defendant contractors or their association with any acts of intimidation, violence or harassment. Thus defendant contractors and association are dismissed as parties to this injunction *pendente lite* proceeding.

## II.

### FINDINGS OF FACT

As in most litigation, the instant case cannot be simplistically cast by a finding that only angels dwell on one side and only villains on the other. The reality and complexity of human affairs usually encompass a broader spectrum and mixture of characters who at various times ambivalently display qualities of good or evil. Thus, necessarily, several singular events must be broadly probed to ascertain their interrelationship with prior and subsequent acts. Through the testimony of witnesses, the panorama of this case is not one of only blacks on one side and whites on the other. This case has less of the continuous, brutal racist conduct which was so often legendary in many of the classic southern civil rights cases of the 1960's.[10] Instead, this matter has a northern syndrome where individuals have professed commitment to civil rights, but some (though by no means all) of their actions repudiate their rhetoric for equality.

### A. *The Events Prior To And Of June 9, 1972.*

Prior to June 9, 1972, some blacks felt that black operating engineers and potential applicants were not receiving equal opportunities for jobs and privileges by reason of discrimination of the unions and the contractors. The Union and the contractors have steadfastly denied any acts of racial discrimination. Prior to June 9, 1972, there is no evidence of record to indicate racial violence or any acts of intimidation against blacks by reason of the November, 1971 lawsuit.

Apparently, the several depositions have been intense episodes; on no fewer than three or four occasions while in the midst of depositions, Counsel have requested this Court's ruling as to whether witnesses or parties should be sequestered and for other deposition rulings.

On June 6, 1972 Marion J. Eaddy (hereinafter referred to as "Eaddy") a black and a named plaintiff, was deposed at the law offices of Freedman, Borowsky and Lorry, Philadelphia, Pennsylvania, counsel for the Union. At his deposition, Eaddy testified, *inter alia*, that George A. Holland (hereinafter referred to as "Holland") had represented and assured him that as an operating engineer he would earn as much as $15,000.00 to $20,000.00 per year. Holland is, like Eaddy, black and a member of Local 542. Since 1969, Holland has been an appointed business agent for Local 542.

On Friday, June 9, 1972, while outside the union hiring hall, Eaddy alleges that he was questioned by Holland concerning the testimony which Eaddy had purportedly given at the June 6, 1972 depositions about Holland's prior promises and assurances. In Holland's words, the events took place as follows:

"I parked the car across from the gas station, and I walked over to the Hall

10. *E. g.*, United States v. Price, 383 U.S. 787, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966); United States v. Guest, 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966); United States v. Barnett, 376 U.S. 681, 84 S.Ct. 984, 12 L.Ed.2d 23 (1964); Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5, 19 (1958).

at the Vine Street entrance. Mr. Eaddy was standing there with one foot on the step and one on the sidewalk. I said, 'Hello, Marion, how are you?' He said, 'Okay'. I said, 'I would like to ask you a question, Marion.' I said, 'You know I never promised you $20,000.00 a year'." (N.T. 225).

From that point of the conversation, there is complete disagreement as to the events which took place between Holland and Eaddy. Eaddy testified that he "could smell alcohol on him [Holland] before he got there a few yards," that Holland cursed at him and then said: "When did I ever ask you—when did I ever promise you $15,000 or $20,000?" (N.T. 55.) and he started pushing Eaddy " . . . with both hands and put his hand in his pocket and started easing up on me. He pulled a razor and he was waiving the razor in the air." (N.T. 55.)

Eaddy further testified that Holland was " . . . yelling so hard and loud that Bill Ciavaglia [a union official] and some men came out and had to drag him into the union hall and get him away from me." (N.T. 55.) Holland denies the altercation outside the union hall and claims that all he did was walk into the union office after having inquired about Eaddy's testimony at the June 6th deposition. (N.T. 55.) Several minutes after the first confrontation outside, Eaddy alleges that Holland threatened him again in the union hall with a straight razor. (N.T. 56, 57.) Eaddy further alleges that in defense he struck Holland several times after Holland's threat with the straight razor, that he knocked Holland to the floor, and kicked him.

The record as to the June 9th events has such patent contradictions that I am uncertain whether there is a preponderance of credible evidence to establish that Holland was the physical aggressor. Thus if my findings had to be based solely on the events of June 9th, I would not find that plaintiffs had met their burden of proof to obtain injunctive relief. In view of Eaddy's youth and vigor and Holland's older age and purported deteriorating health, I find that it is highly questionable whether Holland was the physical aggressor, though the record shows that by reason of the June 6th deposition Holland was angered and hostile towards Eaddy because of the testimony Eaddy had given on June 6th. At a minimum, the record shows that there has been, at least from Eaddy's standpoint, a long standing antagonism against Holland. Even when using his mildest language, Eaddy characterized Holland as an "Uncle Tom" and thus inferentially as one who for selfish and personal reasons worked against the advancement of other blacks. Holland denies vigorously those charges and asserts that he has been instrumental in helping rather than hindering blacks. (N.T. 236). The events of June 9th are clearly insufficient for injunctive relief. It is significant that plaintiffs never requested any injunctive relief immediately after the June 9th incident; they did not make any claim until further conflicts and violence occurred, which violence had expanded far beyond the mere involvement of Eaddy and Holland.

### B. *Incident Of June 19, 1972.*

John Dent (hereinafter referred to as "Dent") is black; he has been affiliated with Local 542 since April, 1966. He was an impressive and mild witness. His testimony was totally credible. In the petition for injunctive relief, he is referred to as a class plaintiff, thus one purportedly within a category of the class plaintiffs approved by my order of March 13, 1972.

Looking for work as an operating engineer, he arrived at the union hiring hall between 8:00 A.M. and 8:30 A.M. on June 19, 1972. (N.T. 9.)

At approximately 10:30 A.M., Dent was asked by the Union dispatcher and business agent, Mr. William Ciavaglia (hereinafter referred to as "Ciavaglia") to go to 18th and Dickinson Streets, where Eaddy purportedly was having difficulty performing an assigned job. Dent complied; thereafter he and Eaddy returned to the hiring hall at about 1:00

P.M. (N.E. 10). Eaddy then paid his dues and was talking to agent Ciavaglia. (N.T. 12.) Dent's absolutely uncontroverted testimony as to what occurred is as follows:

> "While I was reading the paper I happened to glance up and I see a short, white, Caucasian fellow running across the room with a chair. He hit Marion Eaddy on the back of the head, and Eaddy falls down on the floor, and two guys were standing over Eaddy punching him, and one guy trying to hit him with the chair. I run over. *I pulled the guy with the chair off of Eaddy and holler to the guys in the business hall and the business agent, 'Why don't you help break it up?' I asked them. They just stood and looked at me.*
>
> "Before I knew it, *a large fellow with a blue shirt on hit me across the head with a chair. He had been standing over on the other side of the hall where the rest of the members were playing cards. He hits me across the head with a chair, and I jumped back out of the way.*
>
> "In the meantime Eaddy gets up and still swinging at the guy trying to get him and runs out the hiring hall through the hallway and out the other entrance on 12th Street.
>
> "They stopped concentrating on me, I put the chair down and run out in the hall after him.

> \* \* \* \* \* \*

> "*On my way out, the guys that had attacked Eaddy were standing at the doorway. They hadn't gone outside.* They were standing there, two or three guys, and a *"C" branch agent. His name is McLaughlin, John McLaughlin was standing there.*" (Emphasis added.) (N.T., 12–13.)

Thus, in the presence of the union's business agent, his assistant, a "C" branch agent, and twelve to fifteen union members, Dent and Eaddy were physically attacked and assaulted. (N.T. 139). Dent also testified, and I find, that fifteen minutes prior to the assaults " . .

the guy who hit Eaddy with a chair [had been] inside Bill Ciavaglia's office with another agent, business agent George Holland." (N.T. 13, 15, 25, 26.) Mr. Ciavaglia denies that he knew or could identify the assailants; (N.T. 140) he testified that he was shoved aside by someone "white" as Eaddy was hit with a chair. (N.T. 139, 161.) I do not find Ciavaglia's testimony credible that he did not know the assailant with whom he and Holland had been previously talking. Moreover, Ciavaglia testified that his office was usually locked and he did not allow anyone in the office except on "rare occasions." (N.T. 158.) I find that the men who attacked Eaddy and Dent were white operating engineers, (N.T. 161) and that the attack was not attributable to any improper or provoking conduct by either Eaddy or Dent. (N.T. 163).

Further, Mr. Ciavaglia observed the entire attack upon Eaddy and Dent; he rendered no assistance; and he did not call the police. He stated on cross-examination:

> "Q Did you break it up?
> "A *No, I did not.*
> "Q Did you call the police?
> "A *No, I did not.*
> "Q Did you have Mr. Sautter, who was in the building, call the police?
> "A *No, I did not.*" (Emphasis added.) (N.T. 165).

Mr. Sautter, Mr. Ciavaglia's assistant, also observed the events of the 19th. Mr. Sautter's testimony was in many ways evasive. He testified with guarded and questionable candor. However, he admitted to at least the following:

> "Q You saw the man actually running with the chair?
> "A I seen him when he got into my view, yes.
> "Q Did you do anything about it?
> "A *No.*
> "Q You didn't?

"A *No.* There was no way I could do anything about it. I am inside a concrete enclosure.

"Q Did you shout?

"A No.

"Q You could have, couldn't you?

"A No.

"Q Why not?

"A *Because I couldn't. I am not used to shouting.*

\* \* \* \* · \*

"Q How long did you observe the incident?

"A Oh, I would say no more than ten seconds.

"Q And then what did you do?

"A *I went to lunch.*" (Emphasis added.) (N.T. 210).

The record conclusively establishes, and I find that Ciavaglia and Sautter (union officials) and other union members present rendered no assistance, aid, or help to Dent and Eaddy while they were being assaulted by white operating engineers. I find that Ciavaglia's and Sautter's refusal to render assistance to Eaddy and Dent was part of a conspiracy and plan to permit Eaddy to be attacked because he is a named plaintiff in the suit and to permit other blacks to be attacked when the latter support the named or class plaintiffs.

Because I have found that the June 9th event was not sufficient *in itself* to warrant relief, it is essential to note the significant difference between the June 9th and June 19th events. For whatever antagonism Eaddy may have had for Holland, regardless as to who was the aggressor on June 9th, it is obvious that Eaddy and Dent were neither aggressors nor instigators in any respect as to events which took place on the 19th. The business agent, Mr. Ciavaglia, testified that the men attacking Eaddy were white (N.T. 161) and that the attack on both Eaddy and Dent was unprovoked. (N.T. 163.)

C. *The Incidents of June 20, 1972.*

Plaintiff Cleveland Allen (hereinafter referred to as "Allen"), is a 28-year old black operating engineer. He is a seven-year, eleven-month veteran of the United States Army who had learned his trade while in the service, including a two-year tour of operating heavy equipment in Vietnam. Like Dent, he too was an impressive and mild witness; his testimony was totally credible. "Seeking work", Allen arrived at the hiring hall around 7:20 A.M., on June 20, 1972. Upon arrival he was not aware of the prior events of June 9th and 19th (N.T. 93-97). While hoping for a potential assignment he was outside the union hall around 8:00 A.M., "to catch some air and just wait around." (N.T. 97).

As a direct result of events which occurred on June 19th, plaintiffs Dent and Eaddy had informed the local police of their plight. (N.T. 17, 19 and 47.) In response to the incident report of June 19th filed by a police officer, on June 20, 1972, the Philadelphia Police Department sent three representatives from the Philadelphia Police Labor Squad to the hiring hall of Local 542 to investigate and maintain the peace. (N.T. 115). Dent testified as to the events of the morning as follows:

"Marion Eaddy, Cleveland Allen, who is another operating engineer, and myself, was outside approximately a quarter to 10 or 10 o'clock talking to Officer Morrison when we observed that four or five pickup trucks with anywhere from four to five guys in them start driving along the union hall looking for parking spots. All of the pickups had operating engineers in them, guys I seen before, and they started parking. There was cars coming in.

"Q How did you know they were operating engineers?

"A Well, I seen some of them before, and all the trucks had campaign stickers all over them saying, 'Business Agent Walsh for business manager.'

"Q That is Robert Walsh, the business manager of the union?

"A Yes.

"Q Were these men white or black?

"A They were all white.

"Q Go on.

"A They all parked, and I guess from forty to fifty guys, they all went into the union hall while we were still outside talking to Officer Morrison. I told Officer Morrison, '*I think there is going to be trouble in here because there has never been that many guys in the hall before unless there is a union meeting.*'

He says he will go inside and find out why everybody is gathering. Ten minutes later he came back out and said one of the B.A.'s told him the guys are just out of work and hanging around the hall.

"I said, 'There is going to be trouble in here, and you better get some help.'

He said, 'O.K.' He went and got his car and drove it around the block and parked in front of the union hall. By this time groups of three and four and five guys start coming out the hall and gathering around, leaning on the cars in the parking lot all the way around where we were standing in front of the hall.

"Q Were these men white or black?

"A They were all white.

"Q Then what happened?

"A There were a bunch of guys leaning over my car, eight or ten guys leaning all over my car, and I walked toward Officer Morrison who met with two other detectives from his office and told him I was about to tell them to watch them guys on my car. I think they are going to do something with it. By that time we look up the street and Eaddy is half the way up the block fighting with two or three guys, and all the guys congregating run on down there towards

him. I told the officer, 'Go and try to stop them because they are going to hurt him.' They started running up, and I was running trying to stay with them.

On the way, the other fellow, Cleveland Allen, was getting beat halfway between myself and Eaddy. A bunch of fellows was around him, had him on the ground beating him and punching him.

"Q How many people were beating and punching him?

"A About ten or twelve, a dozen guys laying over him, trying to swing at him and punch him. Someone pulled me on my jacket and ripped my coat, and somebody punches me in the back of the head and knocked me down. All I remember, there was a bunch of guys over me kicking and cursing me, and trying to punch me. A guy hit me in my ribs, and beat me until the officer came and pulled me up and kept the guys away from me.

"Q Were these men that hit you white or black?

"A They were all white." (Emphasis added.) (N.T. 21–24.)

Both Allen and Eaddy corroborate Dent's testimony. As Allen said, he was too far away to hear the conversation with Dent but "this white fellow, he hit Eaddy first. He attempted to but Eaddy blocked the punch." (N.T. 103). The testimony of record is unchallenged that Dent, Eaddy and Allen were attacked without provocation by groups of white operating engineers. (See N.T., 104, 106, 108, 118, 119, 120, 122, 125). Officer Felton Morrison of the Philadelphia Police Labor Unit also corroborated the testimony of Allen, Dent and Eaddy (N.T. 118, 119 and 120).

D. *Eaddy's Vulgarity and Hatred: An Irrelevant Defense.*

The major strategy of the Union's defense appears to be (1) the branding of Marion Eaddy as a black who hates

whites and as one who constantly uses four-letter curse words, and (2) to argue that the violence was insignificant or almost nothing more than the fact that boys will be boys.[11]

### THE VULGARITY ISSUE

■ When starting the defense of his case, Mr. Freedman, counsel for the Union said,

"Your Honor; there will be some nasty expressions, very nasty expressions, and I would ask that the Courtroom be clear of women, Sir.

"THE COURT: Well, it's a public Courtroom." (N.T. 129.)

After I denied the request, the Union's counsel suggested that at least the female Deputy Clerk, Mrs. Amelia Fears, should be permitted to leave the Courtroom. In quoting what the parties purportedly had said during previous incidents, four-letter words were repeated in great numbers at the hearing. However, as most witnesses agreed, neither side was deficient in the espousal of obscenities.

As one witness said, "Everybody curses . . . uses profanity" including " . . . anybody in the trades, engineers, or anybody else." (N. T. 258.)

The record establishes that many of plaintiffs' and defendants' witnesses espoused obscenities with equal alacrity. In any event, Eaddy's use of vulgarity on other occasions does not justify a finding that Eaddy was provocative on June 19th or 20th.

In Cohen v. State of California, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971), in a crowded courtroom corridor where women and children were present, the defendant wore—in the words of the United States Supreme Court—"a jacket bearing the words 'Fuck the Draft' which [words] were plainly visible." 403 U.S. at 16, 91 S.Ct. at 1784. The Supreme Court held that defendant's conduct was not a breach of peace and that the four-letter expletive was protected by his First and Fourteenth Amendment constitutional rights.

Though I do not recommend "four-letter words" as a skill essential for effective communication, I must hold that in this case those words are of no substance as a valid defense for the Union. Business agent O'Donoghue used the same expletive against Dent even though Dent had not said or done anything provocative. (N.T. 31.)

### THE HATRED ISSUE

From some black union members who were called as defense witnesses, there is evidence that Mr. Eaddy has spoken to blacks about his antagonism for whites. But there is no evidence that Mr. Eaddy had expressed these racial invectives to whites. Of course, it is regrettable if, by the nature of his experience in life, Mr. Eaddy has developed a hatred for whites. But if, as Mr. Justice Frankfurter so often observed, " . . . there comes a point where this Court should not be ignorant as judges what we know as men,"[12] I must observe that regrettably there is much hatred in America, some Negroes hating whites and some whites hating Negroes. The history of the labor movement reveals that at various times racism was so institutionalized that Negroes were excluded from many unions.[13] The his-

---

11. Counsel for the Union also stated:
"Now, I would say to Your Honor that this whole situation is something which is blown up completely out of proportion out of not a little thing, Your Honor, but out of nothing, absolutely nothing. It is not a big thing out of a little thing. It is a big thing out of nothing, and Eaddy, sensing that he was going to be arrested, could very well have taken this means to get himself out of a scrape. Now, I don't know. That is conjecture." (N.T. 310.)

12. Watts v. Indiana, 338 U.S. 49, 52, 69 S.Ct. 1347, 1349, 93 L.Ed. 1801 (1949).

13. See H. Northrup, Organized Labor and the Negro (1944); S. Spero and A. Harris, The Black Worker (1931). See generally Steele v. Louisville & Nashville R. Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944); Tunstall v. Bhd.

tory of the labor movement also shows that some unions have made major efforts to eradicate discrimination.[14]

Racism and hatred of blacks has been pervasive in our national history. Even in this century when a most moderate colored leader, Booker T. Washington, had lunch with President Theodore Roosevelt, extraordinary hatred was expressed by many white leaders.

"The *Memphis Scimitar* said, 'The most damnable outrage which has ever been perpetrated by any citizen of the United States was committed yesterday by the President, when he invited a nigger to dine with him at the White House.' Senator Benjamin Tillman of South Carolina said, 'Now that Roosevelt has eaten with that nigger Washington, we shall have to kill a thousand niggers to get them back to their places.' Georgia's governor was sure that 'no Southerner can respect any white man who would eat with a negro'." [15]

\*　\*　\*　\*　\*　\*

"Lynching found its defenders in high places and low in the early years of the twentieth century. A coroner's jury in Charlotte, North Carolina, said that members of a mob which killed a Negro 'would have been recreant to their duty as good citizens had they acted otherwise.' A Jacksonville, Florida, minister thought that the only check on mob violence was that the 'mob be certain "beyond a reasonable doubt".' The historian Albert Bushnell Hart noted that railroads ran special trains in order to carry parties of lynchers and that 'the burning at the stake of Negroes has been advertised by telegraph.' It was his opinion that 'the whole fabric of defense of lynching . . . in some cases and for some crimes is justified by the large majority of white men and women in the South . . .' A doctor of philosophy who wrote a volume devoted to *The Truth About Lynching* was convinced that when 'proper restraint is removed from the Negro he gets beyond bounds . . . hence lynching to hold in check the Negro in the South.' Senator Tillman was fond of boasting that he had killed Negroes as a mob member and of asserting that he

of Locomotive Fireman, 323 U.S. 210, 65 S.Ct. 235, 89 L.Ed. 187 (1944) ; H.R. Rep.No.718, 89th Cong., 1st Sess. 2–3 (1965) which states:

> "The following points will pertinently emphasize the prevalence of the problem and the impact which employment discrimination has upon the Nation.
>
> (a) Job discriminaton is extant in almost every area of employment and in every area of the country. It ranges in degrees from patent rejection to more subtle forms of invidious distinctions. Most frequently it manifests itself through relegation to 'traditional' positions and through discriminatory promotional practices. The maxim, 'last hired, first fired,' is applicable to many minority groups, but most particularly Negroes, as is evidenced by the greater unemployment rate for these groups.
>
> (b) Discrimination by labor organizations, particularly certain construction unions, with respect to membership and apprenticeship training is widespread. Segregated locals still exist despite continuous statements of opposition by national labor leaders."

*See also* II T. Emerson, D. Haber, N. Dorsen, Political and Civil Rights in the United States Chap. 18 (1967).

14. The most comprehensive assessment of recent progress can be found in the multi-volume studies of Professor Herbert R. Northrup, et al., Studies of Negro Employment, University of Pennsylvania Press (1971).

15. L. Miller, The Petitioners 206–07 (1966). Miller continues:

> "The ultimate obscenity was sponsored by Governor James K. Vardaman of Mississippi, in his newspaper: 'It is said that men follow the bent of their geniuses, and that prenatal influences are often potent in shaping thoughts and ideas in after life. Probably old lady Roosevelt, during the period of gestation, was frightened by a dog, and that fact may account for the qualities of the male pup that are so prominent in Teddy. I would not do either an injustice, but am disposed to apologize to the dog for mentioning it.' There was more much more, in the same scurrilous vein by newspapers, officeholders and southern politicians." *Id.* at 207.

stood ready to lead other lynchers on the proper occasion." [16]

But, racial animosity against Negroes was not reserved solely for the South. As Professor Phillip W. Jeffress commented on the Philadelphia, Pennsylvania transit disputes in 1943–44:

"In 1943 the FEPC [Fair Employment Practice Commission] had stepped in and ordered affirmative action by management and union officials. Instead of complying with this order, PRTEU [Philadelphia Rapid Transit Employees Union] bitterly attacked the FEPC officials and accused them of trying to destroy the seniority system of PTC. Officials continued to hide behind a clause in the union contract concerning seniority which referred neither to Negroes nor to upgrading.

"When this contract with PRTEU was voided by the new election, FEPC again asked PTC officials to proceed with upgrading, expecting help from the more progressive TWU. The deposed independent union leaders used the race issue to build up sentiment against the new TWU local union. The old propaganda about destruction of the seniority system was revived, mainly through posted signs urging PTC employees to 'protect the seniority of their fellow workers in the armed services by refusing to work with Negro operators.'

"The bitter fighting between TWU officials and those who wanted to force them out of Philadelphia culminated in the strike on the morning Negroes were first to operate transit vehicles. TWU denounced the strike at the beginning, and its stewards exerted every effort to get the strikers back to work. PTC management, however, was passive, at no time appealing for the strikers to return. Only when the army moved in did the workers return, and Negroes begin to operate buses.

"The experience in Philadelphia was clearly one of discriminatory hiring and upgrading practices by the transit company, continually upheld and perpetrated by union struggles. When all else seemed right for a progressive change to more liberal hiring and upgrading policies, the labor-management relations were such that change was impossible, again until government pressure compelled the acceptance of change." [17]

As recently as 1968, a Presidential Commission, the National Advisory Commission on Civil Disorders, said:

"Discrimination and segregation have long permeated much of American life; they now threaten the future of every American.

\* \* \* \* \* \*

"Segregation and poverty have created in the racial ghetto a destructive environment totally unknown to most white Americans.

"What white Americans have never fully understood—but what the Negro can never forget—is that white society is deeply implicated in the ghetto. White institutions created it, white institutions maintain it, and white society condones it." [18]

Nine of the eleven members of the Civil Disorders Commission were white. It was a representative commission com-

16. *Id.*

17. P. Jeffress, The Negro in the Urban Transit Industry 35–36 (Racial Policies of American Industry Series, Rpt. 18, 1970). An example of earlier extreme northern racial hostility occurred on August 13, 1911, "when Zachariah Walker, a black man, allegedly killed a white constable in a fight in Coatesville, . . . ." Pennsylvania. "Walker, injured in the fight, was taken to a hospital from which he was removed by a mob, dragged through the streets on a hospital cot to which he was chained, dumped on a flaming wood pile and burned to death." 79 The Crisis 184 (1972).

18. Report of The National Advisory Commission on Civil Disorders, p. 1 (March 1, 1968).

posed of a Governor, a Mayor, two United States Senators, two United States Representatives, the President of the United Steel Workers of America, the Executive Director of the N.A.A.C.P. [National Association for the Advancement of Colored People], a leader of industry, a Chief of Police of Atlanta, Georgia, and a Commissioner of Commerce from the State of Kentucky.

█ Since such a representative commission found that there was substantial division, polarization and racial hatred in America in 1968, I am not shocked if some men like Marion Eaddy in 1972 have some residuum of hatred. I deplore the hatred; as the Commission found:

> "This deepening racial division is not inevitable. The movement apart can be reversed. Choice is still possible. Our principal task is to define that choice and to press for a national resolution.

> "To pursue our present course will involve the continuing polarization of the American community and, ultimately, the destruction of basic democratic values.

> "The alternative is not blind repression or capitulation to lawlessness. It is the realization of common opportunities for all within a single society." [19]

All of us—black and white—must join together to eradicate our legacy of yesterday's hatred to build a tomorrow of mutual dignity, respect and total justice. But on today's present record whether Eaddy has hatred for whites or whether some whites have hatred for blacks, the hatred *per se* is no basis for judicial intervention. It is only when, as here, that the hatred has been catapulted into actual repressive actions and violence that judicial intervention is required. Eaddy never took any repressive actions, provocative or physical, against any whites. He was blameless on June 19th

and 20th. I find that the Union's defense as to Eaddy's hatred and vulgarity is irrelevant and specious. It is a defense without substantive merit.

### E. *Conspiracy or Fortuity?*

The union offered no evidence whatsoever to rebut plaintiff's allegations as to the unprovoked attacks of June 19th and 20th; they categorize the attacks as a mere fortuity. The simultaneous arrival of 40 to 50 men at the hiring hall in trucks and cars around 10:00 a. m. was highly unusual, if not unprecedented. (See N.T. 21, 52, but cf N.T. 170). Thus, it is not surprising that when Dent observed the 40 to 50 guys arriving with trucks and campaign stickers that he said to Officer Morrison instantly, "I think there is going to be trouble in here because there has never been that many guys in the hall before unless there is a union meeting." (N.T. 22)

The union asserts that the men arrived on the 20th to seek job assignments as marshals for the impending labor march on Norristown, Pennsylvania. The Altemose Construction Company had been using non-union labor to construct a building in King of Prussia, Pa., where in June there had been substantial violence and property destruction. As a result, a Montgomery County, Pa., Judge had issued a broad injunction against picketing and violence. In response to the injunction and the Altemose Construction Company's use of non-union labor, the Building Trade Union declared a non-work holiday for June 22, 1972, to protest the use of non-union labor and the breadth of the injunction.[20] (N.T. 145, 146, 169)

According to the Union, these 40 or 50 white operating engineers suddenly arrived as a group at the request of a Business Agent of Local 542, Mr. O'Donoghue, to receive assignments as mar-

19. *Id.* pp. 1–2.

20. The parties did not fully develop on the record all of the facts of the Union's non-work holiday; however, these were matters which were front-page items in the Philadelphia newspapers during the week of June 19, 1972, and the use of marshals could only have reference to the above. N.T. 146, 169, but cf. N.T. 120, 121.

shals. Mr. Ciavaglia stated in this regard:

"... there was quite a few fellows I seen coming into the hall. *One came over to the window, and I said, 'What are you doing here today, bud?' And he said, 'Well, we are supposed to get assignments for the march tomorrow, who was going to be marshals or counters or what have you?'*

\* \* \* \* \* \*

"A. And not long after that I heard from Mr. *O'Donohue* on our car radios that he was coming in to meet these fellows, and I don't know when, but the next thing I knew was everyone running out the hall, and I didn't know anything after that."

(N.T., 145–146; see also, N.T. 169) (emphasis added).

Mr. Dent described Mr. O'Donoghue's actions as follows on the 20th:

"Q Do you know the names of any of the individuals who attacked either yourself, Mr. Eaddy, or Mr. Allen?

A. Only a few on a first-name basis that actually did the attacking. I have seen them on jobs and in union meetings. None of them I knew the last names except the business agent was standing out there.

Q What is his name?

A That is Joe Donohue. *He was cursing at me and telling me how I am fucking the union up, he says. He was cursing at me.*

Q Did he come with the forty or fifty men who drove up in those trucks?

A Right after the guys were coming in all at the same time I noticed him coming across Vine Street. He was walking with some fellows, and they came into the union hall, too." (N.T. 31) (emphasis added)

Plaintiffs' Exhibit P–1 is written on official union letterhead which lists the name of C. J. O'Donoghue as a Business Agent of Local 542. The notes of testimony refers to a Business Agent as Joe Donohue. In view of Mr. Ciavaglia's testimony, I find that the C. J. O'Donoghue noted on the letterhead as a business agent is the same person as referred to in the transcript as "Joe Donohue". (N.T. 31, 146.)

It is not significant whether the men came originally to merely receive assignments as marshals or whether they came originally for the sole purpose of attacking black named and class plaintiffs. The relevant fact which I find is that at least after they arrived at the hiring hall, and probably before they arrived at the hiring hall, they had a "meeting of the minds" and an agreement to conspire to attack black named and class plaintiffs. The attack was a direct follow-up of the events which occurred on June 19, 1972; the attacks and conspiracy took place for the purpose to further intimidate Eaddy and any other blacks associated with or supportive of Eaddy in the litigation in issue.

The union was able to produce witnesses who testified about Eaddy's vulgarity of a year ago and of events in the distant past. Yet, for the critical events during the very week in which the emergency hearing was being held, the Union did not produce business agent O'Donoghue and offered no explanation as to why they failed to call O'Donoghue who was in the midst of the violence of June 20, 1972. The Union did not produce even one of the persons who had purportedly come to the union hiring hall on June 20, 1972 to receive assignments as marshals. These "marshals" were known to O'Donoghue, had been invited by O'Donoghue, and were the ones engaged in the direct violence and assault on three innocent black union members. When considering the Union's capacity to produce witnesses to testify on vulgarity and their failure to provide critical witnesses who were involved in or observed the violence, Chief Judge Devitt's remarks are most appropriate.[21]

21. As to all findings, except as to the conspiracy issue, their legal significance is discussed in Parts IV and V, *infra*. However, because the conspiracy issue is so interrelated to the facts, I am discussing the applicable law of conspiracy in this subsection.

"Reviewing courts have approved instructions and comments embodying the rule that if either party has it peculiarly within his power to produce a witness whose testimony would elucidate the transaction, failure to do so creates the presumption that the testimony would be unfavorable." [22]

In Glasser v. United States, *supra*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680, (1942), the Supreme Court stated in regard to the *sufficiency of proof* in proving a criminal conspiracy:

"Participation in a criminal conspiracy need not be proved by direct evidence; *a common purpose and plan may be inferred* from a '*development and collection of circumstances*'." (p. 80, 62 S.Ct. p. 469) (emphasis added)

The Court of Appeals for the Third Circuit in United States v. Barrow, 363 F.2d 62 (3rd Cir. 1966), cert. den., 385 U.S. 1001, 87 S.Ct. 703, 17 L.Ed.2d 541 (1966), held similarly in this regard that:

"The crime of conspiracy, . . . is seldom susceptible of proof by *direct evidence*. Proof of the crime may rest as it frequently does, on indirect or circumstantial evidence. The existence of a conspiracy may be inferred from evidence of related facts and circumstances from which it appears, as a reasonable and logical inference, *that the activities of the participants in the criminal venture could not have been carried on except as the result of a preconceived scheme or common understanding*." (citations omitted)— p. 64. (emphasis added)

In Adickes v. S. H. Kress and Company, 398 U.S. 144, 149, 152, 90 S.Ct.

1598, 1606, 26 L.Ed.2d 142, Mr. Justice Harlan reminded us that all that need be proven is that the parties "somehow reached an understanding" and that "It is enough that he is a willful participant in joint activity. . . ." [23] The attackers were willful participants in a joint activity. They had "reached an understanding" and had thereby formed a conspiracy to intimidate, harrass, and perpetuate violence as noted above. There is no other explanation for the language of business agent O'Donoghue uttered at the moment when Dent was being beaten and O'Donoghue saying Dent was "f...ing the Union up." (N.T. 31.)

Counsel for the union states that these matters were "not union business. It was outside on the sidewalk". (N.T. 308.) He categorizes the incident as a mere scuffle and something which plaintiffs' counsel has "blown up completely out of proportion . . .", that "It is not a big thing out of a little thing, it is a big thing out of nothing . . ." (N.T. 310) The "big thing out of nothing" was described by Officer Morrison as follows:

"I couldn't tell who was striking who. When I went to help Mr. Eaddy I went to try to pull these people off him, and my attention was attracted to Mr. Allen. As I approached him, the other officer from the Labor Squad came over to help him, and I rushed to the assistance of, I believe it was, Mr. Dent. It was happening so fast, I don't know just who. *I knew it was three individuals involved in a fight with these groups of people, and I was trying to get them away from them to try to stop anybody from getting injured.*" (N.T. 122) (emphasis added)

22. Devitt and Blackmar, Federal Jury Practice and Instructions, p. 249 (1970). *See also* McAbee v. United States, 111 U.S.App.D.C. 74, 294 F.2d 703, 705 (1961), cert. denied 368 U.S. 961, 82 S.Ct. 406, 7 L.Ed.2d 392, cert. denied 382 U.S. 854, 86 S.Ct. 104, 15 L.Ed.2d 92; Richards v. United States, 107 U.S. App.D.C. 197, 275 F.2d 655, 657, 658 (1960), cert. denied 363 U.S. 815, 80 S.Ct. 1253, 4 L.Ed.2d 1155; United

States v. Lawrenson, 298 F.2d 880, 885 (4th Cir. 1962), cert. denied 370 U.S. 913, 82 S.Ct. 1260, 8 L.Ed. 406 and 370 U.S. 947, 82 S.Ct. 1594, 8 L.Ed.2d 812; Lawson v. United States, 101 U.S.App. D.C. 332, 248 F.2d 654, 656 (1957), cert. denied 339 U.S. 934, 70 S.Ct. 663, 94 L.Ed. 1352.

23. See also United States v. Price, 383 U.S. 787, 794, 86 S.Ct. 1152, 1157, 16 L.Ed.2d 267 (1966).

These were not incidents of playful tussles of boys being boys, for when men are attacked with chairs serious injuries or death can ensue. When ten to fifteen men gang up on one individual and when they cannot be restrained even when armed policemen are present, these actions are more than a childish prank.

With this history of violence, it is understandable why Mr. Eaddy concluded his testimony by saying, "I don't want to work no more in the city. It is unsafe on the job site. People trying to kill me. There is nothing nobody is going to do about it until I end up dead in the paper . . ." (N.T. 84.) In response to cross examination, Mr. Eaddy appropriately replied, "After what happened yesterday, the day before it wasn't play. I don't call that a joke at all." (N.T. 84.)

In a nation which has been so often rocked with violence, or challenge is to develop alternatives to violence. The most appropriate alternative is evolving rules of law where disputants seek to resolve their differences in court rather than to riot on the streets. Fortunately and appropriately, the black plaintiffs have chosen the non-violent method by pursuing their disputes in a federal court. However, if defendants' violence is not precluded by federal law, certainly some blacks who are named or class plaintiffs might feel uncertain about their future physical security if the federal courts are remediless to thwart that violence which is directed against federal litigants.

The issue cannot be relegated to the simplistic conclusion, in counsel's argument, that some blacks have confidence in the Union and that therefore there is no animosity against blacks. (N.T. 312, 313.) From the time of slavery to the present, there have always been some blacks on each side of every racial issue, in fact some blacks even owned slaves. Thus a judgment must be made on the totality of facts rather than whether some blacks are friends of the Union's distinguished counsel, or friends of the business agents.[24]

The attacks of the 19th and the 20th cannot be explained or "justified" unless one adopts the rationale that because one black (Eaddy) may have some hatred against some whites because of their purported discrimination that as a result any white can assault any black (Dent and Allen). For, in a real sense, the nub of the Union's explanation of the events of June 19th and 20th has to be based on such a rationale. For here we have a tragic situation where black men going to the union hall looking for work are attacked by large numbers of white operating engineers without any justification. The attacks took place *after* the law suit and *after* the depositions. It cannot be a fortuity that suddenly on June 19th men jumped up in a Union Hall and start running with chairs to attack black members—such simultaneous activity is not an event of spontaneity but rather the part of a plan to intimidate and harass.

Every thoughtful study emphasizes our nation's burden to check that hate which is escalated to violence. Tragically here the union not only failed to take an affirmative position to preclude the violence, but it was a part of the conspiracy to perpetuate it. As to the events of June 19th and 20th, "The mind of justice, not merely its eyes, would have to be blind to attribute such an occurrence to mere fortuity."[25]

### III.

### JURISDICTION

There are five alternative grounds on which plaintiffs could predicate jurisdic-

24. In his closing argument, counsel for the Union also stated:

"I am not a racist, and Your Honor knows I am no racist, and Your Honor knows I have been involved more on the black side than on the white side, of which I am very proud." (N.T. 303.)

25. Avery v. State of Georgia, 345 U.S. 559, 654, 73 S.Ct. 891, 894, 97 L.Ed. 1244, concurring opinion of Mr. Justice Frankfurter, (1953).

tion on their claim for an injunction *pendente lite:*

(1) The Court's inherent power to protect federal court litigants from violence, intimidation or harassment when designed to deter use of the federal courts.

(2) Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., 78 Stat. 253 (1964), as amended.

(3) 42 U.S.Code § 1981, 16 Stat. 144, § 16 Act of May 30, 1870, Civil Rights Act of April 9, 1866, 14 Stat. 27.

(4) 42 U.S.C. § 1985(2), 17 Stat. 13, Act of April 20, 1871.

(5) 42 U.S.Code § 1985(3), 17 Stat. 13, Act of April 20, 1871.

The jurisdictional issue has been raised pointedly as to whether this Court has either statutory or constitutional authority to grant the relief requested.

After plaintiffs' counsel requested an immediate hearing for the granting of a preliminary injunction *pendente lite*,[26] counsel for the Union replied, "I would say that this is not a matter for this Court, nor is it a matter of this case. It is a matter for the Philadelphia police and for the Philadelphia judicial authorities . . . if, what he [plaintiffs' counsel] has said is correct, it is unfor-

tunate, but it does not belong in this court." [27]

Though the jurisdictional challenge has been pressed, counsel for the Union has not cited at any time any case to categorize the breadth and nature of his jurisdictional challenge.[28] Thus, I am not certain whether defendant's jurisdictional objection is predicated on the premise that Congress did not intend to create a statutory cause of action or that (regardless of Congressional intent) neither Congress nor the Courts have the constitutional power to grant plaintiffs' relief.

As a result of the pervasive nebulousness of counsel's challenge to the Court's jurisdiction, it is essential that I trace here in some detail, (1) the Court's inherent power to protect federal court litigants from violence, intimidation or harassment when designed to deter use of the federal courts; (2) Title VII of the Civil Rights Act of 1964; (3) the statutory history and applicability of the early Civil Rights Statutes, 42 U.S.C. §§ 1981, 1985(2) and 1985(3); (4) the Supreme Court's original restrictive construction of (a) the early civil rights statutes and (b) the Thirteenth and Fourteenth constitutional Amendments; (5) the more recent construction of the

---

**26.** On the late afternoon of June 20, 1972, the case started by counsel for plaintiff asserting:

> "Again we are back before you in the discrimination law suit that has been brought against the operating engineers and construction industry. Today we are back before Your Honor on much more extraordinary circumstances, I believe, than in the past. . . . We are here because of two incidents of violence perpetrated against the named and class plaintiffs, both yesterday and today. Both . . . [Eaddy and Dent] were involved in the incidents of violence that occurred yesterday.
>
> "Today, in the morning, both of them were again involved in the incident in which they were attacked by white operating engineers.
>
> "Sitting between both of them is Mr. Cleveland Allen, who is a black operat-

ing engineer, as well, and who was attacked this morning.

> " . . . we are prepared right now . . . to indicate to you the severity of the incident and of the violence that is presently going on, . . . [A]t the very end of our presentation I shall ask you for appropriate relief to enjoin and stop this now in the future, and during the pendency of this law suit." (N.T. 3 and 4.)

**27.** N.T. 4–5; see also N.T. 302.

**28.** The union's counsel is an experienced lawyer who has argued many major cases before the U. S. Supreme Court, yet in his entire brief he cites only one appellate case, United Mine Workers of America v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). I cannot believe that when on appeal defendant's counsel will be so niggardly in the citation of authority.

statutes and constitutional amendments by the Supreme Court in the 1960's and 1970's.

## IV.

## THE COURT'S INHERENT POWER TO PROTECT FEDERAL COURT LITIGANTS FROM VIOLENCE, INTIMIDATION, OR HARASSMENT WHEN DESIGNED TO DETER USE OF THE FEDERAL COURTS.

■ At this late date the power of a federal court to issue an injunction to protect litigants from acts of violence cannot be realistically questioned. As long ago as Marbury v. Madison, 1 Cranch 137, 163, 2 L.Ed. 60 (1803), Chief Justice Marshall stated:

"The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury. One of the first duties of the government is to afford him that protection."

The duty of the government to provide litigants both the protection of laws and an impartial forum to hear grievances flowing from a breach of the government's duty has been implemented through the power of the federal courts to issue injunctions to safeguard rights protected by the Constitution and laws of the United States. e. g. Bell v. Hood, 327 U.S. 678, 684, 66 S.Ct. 773, 777, 90 L.Ed. 939 (1946); United States v. Farrar, 414 F.2d 936, 938 (5th Cir. 1969); Brewer v. Hoxie School District No. 46, 238 F.2d 91, 98 (8th Cir. 1956).

As the Supreme Court stated in Bell v. Hood, 327 U.S. at 684, 66 S.Ct. at 777,

"where federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief. And it is also well settled that where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done." (footnotes omitted)

Illustrative of the power of the Federal Court to "make good the wrong done. . ." where federally protected rights have been invaded is Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). In Bivens, the agents were sued for damages for a purported unconstitutional search and seizure. While there was neither a specific statute nor a constitutional provision which in precise terms stated that plaintiff had the right to sue for damages, the Court held that plaintiff was "entitled to recover money damages for any injuries he has suffered as a result of the agents' violation of the [fourth] Amendment." [29]

Thus, Bivens is a persuasive precedent for the proposition that there is an implied right for damages and for injunctive relief arising from the mere enactment of the 13th and 14th amendments to the Constitution. There is also authority that the Court has the inherent right to grant relief in the instant case by reason of the All-Writs Statute [30] and Article III of the Constitution. However, in the instant case (unlike Bivens) we are not required to bridge a language gap and to imply a right for damages; for Congress has filled that void through the passage of Title VII of the Civil Rights Act of 1964 and the Civil Rights Acts of 1866, 1870, 1871 and 1875.

## V.

## RIGHT TO AN INJUNCTION UNDER TITLE VII.

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., repre-

29. Bivens, supra, 403 U.S. at 397, 91 S.Ct. at 2005.

30. 28 U.S.C. § 1651 provides in part:
"(a) The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."

sents an attempt by Congress to bring an end to employment discrimination within the United States. The Title by its own terms applies to purely private discrimination by employers [42 U.S.C. § 2000e(b)] and labor orgainzations [42 U.S.C. § 2000e(d)]. In addition, 42 U.S.C. § 2000e-3(a) provides:

> "It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

Further, under 42 U.S.C. § 2000e-5(f) and (g) a federal court is given jurisdiction and equitable powers to enjoin any unlawful employment practice as defined in 42 U.S.C. § 2000e-3(a) and "order such affirmative action as may be appropriate." Earlier cases under 42 U.S.C. § 2000e-3(a) have largely been involved with courts ordering an employee rehired following a firing after the institution of a Title VII lawsuit. See e. g. Pettway v. American Cast Iron Pipe Co., 411 F.2d 998 (5th Cir. 1969), Barela v. United Nuclear Corp., 317 F. Supp. 1217 (D.N.M.1970).

██ Further, in *Pettway, supra,* at 1000, the Court of Appeals held that the overriding purpose of 42 U.S.C. § 2000e-3(a) is to protect employees who utilize

the tools provided by Congress to protect their rights. Here, the acts of violence against the named and class plaintiffs were clearly the result of the pending Title VII lawsuit against Local 542. A court must and does have the power under 42 U.S.C. §§ 2000e-3(a) and 5(f) and (g) to enjoin those acts of violence in order to protect the integrity of the judicial process which Congress utilized as the ultimate phase in the federal eradication of employment discrimination. If 42 U.S.C. § 2000e-3(a) were interpreted to give a court the power to order reinstatement to an employee who is fired by reason of his having filed a Title VII suit, but is read to prohibit a federal court from restraining overt acts of violence against Title VII plaintiffs, the protections afforded by the statute will truly have little relevancy to the physically injured plaintiff. A statute must not be interpreted so as to create so glaring an inconsistency; but rather the law must be read to implement fully the congressional purpose of ending discrimination in employment. Accordingly, I conclude that plaintiffs have a right implied and expressed in Title VII itself to the injunction here sought.

## VI.

## STATUTORY HISTORY AND APPLICABILITY OF THE EARLY CIVIL RIGHTS STATUTE

In order to understand the full scope of rights protected by 42 U.S.C. §§ 1981, 1985(2) and 1985(3), it is necessary to trace their statutory history from the earliest congressional civil rights legislation and to compare the original language with the present statutes.[31]

---

31. Unfortunately, there are very few collections of the original civil rights act other than the original sources. Thus, often it becomes difficult to compare the statutory modifications which are published in the recent annotated codes. For convenience, I have assembled all of these early civil rights statutes in Appendix B [deleted from published opinion]. These statutes are discussed in some detail in R. Carr, Federal Protection of Civil Rights: Quest for a Sword, (1947); M. Konvitz, The Constitution and Civil Rights (1947); R. Bardolph, The Civil Rights Record, Black Americans and the Law (1849–1970).

There are four as yet unpublished monographs of this subject: *See* Professor Derrick A. Bell, Jr., Race, Racism and American Law, Harvard Law School (1971); Professor Paul Bender, Federal Civil Rights Legislation (1971), Uni-

A. § 1981.

The departure point for analysis of 42 U.S.C. § 1981 is the present statutory language which provides as follows:

"All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

In clear terms § 1981 in relevant part gives "[a]ll persons . . . the same right . . . to sue, be parties, give evidence, . . . as is enjoyed by white citizens, . . ." The statute on its face unambiguously prohibits any racially motivated abridgement of these rights, whether or not the proscribed action is perpetrated by state officials or those otherwise acting under "color of law." [32]

The language which ultimately became § 1981 first appeared in § 1 of *"An Act to Protect all Persons in the United States in their Civil Rights, and Furnish the Means of their Vindication."* Civil Rights Act of 1866, 14 Stat. 27. § 1 of the 1866 Act provided as follows:

*"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled.* That all persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the United States; and such citizens of every race and color, without regard to any previous condition of slavery or involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall have the same right, in every State and Territory in the United States, to make and enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, lease, sell, hold, and convey real and personal property, and to full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens, and shall be subject to like punishment, pains, and penalties, and to none other, any law, statute, ordinance, regulation, or custom, to the contrary notwithstanding."

The key language here is that which states "[a]ll persons . . . shall have the same right . . . to sue, be parties, and give evidence, . . . as is enjoyed by white citizens, . . ."

A comparison of the original language as it appears in § 1 of the 1866 Act and present § 1981 is that the 1866 Act applies to "citizens" while the current § 1981 applies to "persons". This difference in language leads one to examine later statutes in an effort to determine why Congress changed the precisely drafted language.

This necessary historical journey takes one to §§ 16 and 18 of *"An Act to enforce the Right of Citizens of United States to vote in the several States of this Union, and for other Purposes."* Act of 1870, 16 Stat. 140. At the outset it should be noted that § 18 of the 1870 Act provided:

"And be it further enacted, That the act to protect all persons in the United States in the civil rights, and furnish the means of their vindication, passed April nine, eighteen hundred and sixty-six, is hereby re-enacted; and sections sixteen and seventeen hereof

---

versity of Pennsylvania Law School; A. Leon Higginbotham, Jr. and David B. Rigney, Racism and the American Legal Process, (1972) University of Pennsylvania, Graduate School, Department of Criminology and Sociology; Professor Lou Holloway, Speeches of Black Congressmen, Tougaloo College, Tougaloo,

Miss. *See also* H. Graham (Editor), Violence: The Crisis of American Confidence, Chap. VII by A. Leon Higginbotham, Jr., Johns Hopkins Press (1971).

32. Adickes v. S. H. Kress & Co., 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

shall be enforced according to the provisions of said act."

The reason for the re-enactment of the 1866 Act was that the original statute was passed pursuant to the Thirteenth Amendment, and in order to eliminate any constitutional questions as to the statute's applicability to the states it was re-enacted following the ratification of the Fourteenth Amendment.[33]

In addition to re-enacting the 1866 Act, the Act of 1870 had another purpose; for the original language of § 1 of the 1866 Act which became § 1981, appeared again in § 16 of the 1870 Act as follows:

"Sec. 16. *And be it further enacted,* That all persons within the jurisdiction of the United States shall have the same right in every State and Territory in the United States to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of person and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and none other, any law, statute, ordinance, regulation, or custom to the contrary notwithstanding. No tax or charge shall be imposed or enforced by any State upon any person immigrating thereto from a foreign country which is not equally imposed and enforced upon every person immigrating to such State from any other foreign country; and any law of any State in conflict with this provision is hereby declared null and void."

To excise the relevant language here, the statute provided that [a]ll persons . . . shall have the same right . . to sue, be parties, give evidence . . . as is enjoyed by white citizens, . . ." Thus, the only difference between current § 1981 and § 16 of the 1870 Act on one hand, and § 1 of the 1866 Act on the

other is that § 1981 and § 16 apply to "all persons" while § 1 of the 1866 Act applies to "citizens."

■ The change in language from "citizens" to "persons" is on its face a clear broadening of the scope of what was to become § 1981. However, at least one court has concluded that through this change, Congress intended to limit the coverage of § 1981 to only "state action." [34] I disagree; I find that the change from "citizens" to "persons" is consistent with the fact that "state action" is not required under § 1981. First, § 1 of the 1866 Act begins by declaring "That all persons born in the United States . . . are hereby declared to be citizens of the United States . . .". This language was required to overrule the holding in Dred Scott v. Sandford, 60 U.S. (19 How.) 393, 407, 15 L.Ed. 691 (1856) that blacks were not citizens of the United States. Second, when the 1870 Act was passed, Congress re-enacted the protections which it previously afforded to blacks in § 1 of the 1866 Act by declaring blacks to be citizens. Further, Congress extended the coverage of the statute beyond "citizens" to include ". . . all persons within the jurisdiction of the United States . . ." (§ 16 of Civil Rights Act of 1870). Thus, when passing the 1870 Act, Congress did not intend to restrict the scope to "state action," but rather clearly intended to broaden the coverage to include "all persons." Accordingly, I conclude that § 1981 is derived from *both* § 1 of the 1866 Act and § 16 of the 1870 Act. Further, I hold that the Opinion of the United States Supreme Court in Jones v. Alfred H. Mayer Co., *supra,* is controlling here that § 1 of Civil Rights Act of 1866 does not require "state action" as § 1 was passed pursuant to Congress' power under § 2 of the Thirteenth Amendment. 392 U.S. at 437–444, 88 S.Ct. at 2202–2205. Thus, a cause of action is clearly stated under § 1981 without any allega-

33. Jones v. Alfred H. Mayer Co., 392 U.S. 409, 436, 88 S.Ct. 2186, 2201, 20 L.Ed.2d 1189 (1968).

34. Cook v. Advertiser Co., 323 F.Supp. 1212 (M.D.Ala.1971).

tion of state action. This conclusion is buttressed by the Supreme Court's argument in *Jones, supra,* which I adopt as it applies to § 1981,—§ 1 of the 1866 Act applies to private actions, while in § 2 of the 1866 Act Congress provided criminal penalties for violations of § 1 done under "color of law".[35] 392 U.S. at 424–427, 88 S.Ct. at 2195–2196. Therefore, Congress' intent was to exempt the § 1 *private* violations from the criminal sanctions of § 2. In conclusion, I hold that the statutory history analyzed here and the legislative history reviewed in *Jones, supra,* indicate without question that no "state action" is required to state a cause of action under 42 U.S.C. § 1981.

### B. §§ *1985(2) and 1985(3).*

■ Additionally, the black named and class plaintiffs here have a right to the requested injunctive relief under 42 U.S.C. § 1985(2), § 1985(3). Section 1985(2), like its companion provision, § 1985(3) has its historical origins in *"An Act to define and punish certain Conspiracies"*, Act of July 31, 1861, c. 33, 12 Stat. 284 which provided:

"*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That if two or more persons within any State or Territory of the United States shall conspire together to overthrow, or to put down, or to destroy by force, the Government of the United States, or to levy war against the United States, or to oppose by force the authority of the Government of the United States; or by force to prevent, hinder, or delay the execution of any law of the United States; or by force to seize, take, or possess any property of the United States against the will or contrary to the authority of the United States; or by force, or intimidation, or threat to prevent any persons from accepting or holding any office, or trust, or place of confidence, under the United States; each and every person so offending shall be guilty of a high crime, and upon conviction thereof in any district or circuit court of the United States, having jurisdiction thereof, or district or supreme court of any Territory of the United States having jurisdiction thereof, shall be punished by a fine not less than five hundred dollars and not more than five thousand dollars; or by imprisonment, with or without hard labor, as the court shall determine, for a period not less than six months nor greater than six years, or by both such fine and imprisonment."

This predecessor statute merely defined certain conspiracies and made those same conspiracies criminal offenses without providing any civil remedy for any of the defined conspiratorial acts.[35A] Later, in 1871, following the adoption and ratification of the Fourteenth Amendment, Congress passed *"An Act to enforce the Provisions of the Fourteenth Amendment to the Constitution of the United States, and for other Purposes."* Act of April 20, 1871, c. 22, § 1 et seq., 17 Stat. 13. In § 2 of the Act of 1871, Congress broadened the types of conspiracies covered in the original Act of 1861 primarily by adding in relevant part:

" . . . by force, intimidation, or threat to deter any party or witness in any court of the United States from attending such court, or from testifying in any matter pending in such court fully, freely, and truthfully, or to injure any such party or witness in his person or property on account of his having so attended or testified, . . . "

In addition to adding the above language which was to become 42 U.S.C. § 1985

---

35. 62 Stat. 696, as amended 82 Stat. 75, 18 U.S.C. §§ 241, 242.

35A. The 1861 Statute, *supra,* was not a civil rights act; it was solely a conspir-

acy statute to protect the interests and property of the United States Government.

(2), Congress also enacted what became § 1985(3) in the following language:

> ". . . or . . . conspire together, . . . for the purpose, either directly or indirectly, of depriving any person or any class of persons of the equal protection of the laws, or of equal privileges or immunities under the laws, or for the purpose of preventing or hindering the constituted authorities of any State from giving or securing to all persons within such State the equal protection of the laws, or shall conspire together for the purpose of in any manner impeding, hindering, obstructing, or defeating the due course of justice in any State or Territory, with intent to deny to any citizen of the United States the due and equal protection of the laws, or to injure any person in his person or his property for lawfully enforcing the right of any person or class of persons to the equal protection of the law . . ."

In addition, Congress enhanced the battery of remedies available to one whose civil rights had been infringed with the addition of civil remedies, namely a cause of action for damages by stating:

> "And if any one or more persons engaged in any such conspiracy shall do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby any person shall be injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the person so injured or deprived of such rights and privileges may have and maintain an action for the recovery of damages occasioned by such injury or deprivation of rights and privileges against any one or more of the persons engaged in such conspiracy, . . ." (Act of April 20, 1871, c. 22, § 2, 17 Stat. 13.)

On its face, neither § 1985(2) nor § 1985(3) contains any requirement that the prohibited conduct be carried out by state officials, by those in conspiracy with state officials, or by those acting generally "under color of law." When Congress intended to include a "color of law" requirement for conduct under a statute, it clearly did so; for example, 42 U.S.C. § 1983, Civil Rights Act of 1871, c. 22, § 1, 17 Stat. 13, was originally found as § 1 of the Civil Rights Act of 1871. Thus, in the Civil Rights Act of 1871, Congress provided both a remedy for actions done "under color of law" (§ 1) and a remedy for a conspiracy whether or not done "under color of law." (§ 2). Accordingly, when in Griffin v. Breckenridge, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971), the Supreme Court construed § 1985(3), the companion provision to § 1985(2), the Court's rationale was applicable to § 1985 (2). It should be emphasized that § 1985 in its *entirety* was derived from § 2 of the Civil Rights Act of 1871. The conclusion of the Supreme Court in the *Griffin* case, *supra,* that § 1985(3), clearly covers private conspiracies, must likewise apply to § 1985(2) so long as the same caveats are observed as to both statutes. For in the *Griffin* case, *supra,* the Supreme Court carefully analyzed the text, companion provisions and legislative history not just of § 1985(3), but the legislative history of all of § 1985. (§ 20 of the Civil Rights Act of 1871.) In conclusion, I hold that § 1985(2) and § 1985(3) apply to the facts of the instant case, and provide an additional remedy for the private action here complained of so long as one can identify the source of constitutional power to reach the private conspiracy proven at the hearings held in connection with the instant case.

## VII.

### CONSTITUTIONAL AUTHORITY UNDER THE THIRTEENTH AND FOURTEENTH AMENDMENTS FOR THE EARLY CIVIL RIGHTS STATUTES.

A. *The Slumbering Fourteenth Amendment.*

As noted in Part VI, *supra,* if the normal meanings are attributed to the words of §§ 1981, 1985(2) and 1985(3), the statutes clearly reach some acts of

private parties. However, since the enactment of the 13th and 14th Amendments, the threshold question has *not* been whether Congress intended to reach private conspiracies by the explicit language used in the early Civil Rights statutes. Rather, the major issue has been whether the 13th, 14th and 15th Amendments authorized to Congress the constitutional power to enact civil rights legislation which reaches racist private actions.

On the record of the instant case, the violence was initiated by private citizens and thus not by public officials, police or employees of any governmental unit. Therefore, the threshold question here has to be whether under the Thirteenth or Fourteenth Amendments Congress had the right to legislate a cause of action against purely private acts. The debate had been long as to the "original understanding" or intent upon the enactment of the Thirteenth and Fourteenth Amendments.[36] Many persons seem to find some semblance of legislative history for any proposition as to the breadth or limit of these Amendments. Certainly, the construction given these Amendments by the Supreme Court in the 1870's and 1880's substantially diluted, if not, eradicated these constitutional bulwarks as effective instruments to reach purely private acts of racial discrimination. Looking upon this period of the Supreme Court's early interpretations, Professors Frank and Munro started their classic article by noting:

"It is old learning that the Fourteenth Amendment has been interpreted so that its most important sections have little resemblance to the original plan of its sponsors."[37]

At the outset, it must be clearly noted that the question is not whether § 1 of the Fourteenth Amendment of its own force and effect reaches private action; for repeatedly it has been held that § 1 of the Fourteenth Amendment of its own force and effect reaches state action.[38] Rather, the question is whether Congress under § 5 of the Fourteenth Amendment[39] has been given an affirmative grant of legislative power to reach purely private acts of discrimination.

In the first three major Supreme Court cases construing the coverage of the Fourteenth Amendment and the early Civil Rights Acts, the Court seemed to hold that the Amendment was applicable only to state governmental action. (See United States v. Cruikshank, 92 U.S. 542, 23 L.Ed. 588 (1876); United States v. Harris, 106 U.S. 629, 1 S.Ct. 601, 27 L.Ed. 290 (1883); and the Civil Rights

---

36. See, Flack, The Adoption of the Fourteenth Amendment (1908); Frank & Munro, The Original Understanding of Equal Protection of the Laws, 50 Colum. L.Rev. 131 (1950); Frantz, Congressional Power to Enforce the Fourteenth Amendment Against Private Acts, 73 Yale L.J., 1353. *See also,*
Kendrick, Journal of the Joint Committee of Fifteen on Reconstruction (1914); TenBroek, The Antislavery Origins of the Fourteenth Amendment (1951); James The Framing of the Fourteenth Amendment (1956); Harris, The Quest for Equality (1960); 2 Crosskey, Politics and the Constitution 1083–1118 (1953); Boudin, Truth and Fiction about the Fourteenth Amendment, 16 N.Y.U.L.Q. 19 (1938); Graham, The Conspiracy Theory of the Fourteenth Amendment, 47 Yale L.J. 371, 48 Yale L.J. 171 (1938); Fairman, Does the Fourteenth Amendment Incorporate the Bill of Rights? The Original Understanding, 2

Stan.L.Rev. 5 (1949); Graham, The Early Antislavery Background of the Fourteenth Amendment, 1950 Wis.L.Rev. 479 & 610 (1950); Crosskey, C. Fairman, Legislative History and the Constitutional Limitations on State Authority, 22 U.Chi.L.Rev. 1 (1954); Fairman, A Reply to Professor Crosskey, 22 U.Chi. L.Rev. 144 (1954); Graham, Our Declaratory Fourteenth Amendment, 7 Stan. L.Rev. 3 (1954); Bickel, The Original Understanding and the Segregation Decision, 69 Harv.L.Rev. 1 (1955).

37. Frank & Munro, The Original Understanding of Equal Protection of the Laws, 50 Colum.L.Rev. 131 (1950).

38. Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1951).

39. § 5 states: "The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article."

Cases, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1883). These cases are supposed to have laid down at that time the unqualified rule that if federal civil rights legislation is directed at merely "private acts" it must be denounced as unauthorized by the Fourteenth Amendment, and hence is unconstitutional unless some alternative constitutional authority for it can be established.

Despite these earlier cases, as Professor Frantz observes:

" . . . one of the *most significant clues to the original understanding is the situation which the amendment was designed to remedy.* That situation is described at length and in detail in the testimony on conditions in the South taken by the Joint Committee on Reconstruction, the committee which drafted the fourteenth amendment and proposed it to the Congress. *This testimony does refer here and there to instances of discriminatory state legislation, actual or threatened, and more frequently to abuse of power by state officials. But it requires no more than a glance at the testimony in order to see that "state action" in this sense, while it may have had some effect on the flavor of the stew, is very far from being its principal ingredient.* The principal ingredient is a pervasive pattern of private wrongs, motivated by popular prejudice and hostility, directed against Negroes primarily and to a lesser, but significant, degree against Northern whites and against those Southern whites who had been disloyal to their states by being loyal to the Union. If the orthodox theory of the fourteenth amendment is correct, then the committee which studied the situation and attempted to draft a constitutional remedy for it came up with a solution which wholly failed to relate to the main body of the problem. *When the testimony is examined more closely, it becomes apparent that the great bulk of it deals with injustices which are not only "private acts" but acts which would violate any state's ordinary laws against homicide and assault and battery."* (Emphasis added.)

73 Yale L.J. 1353, 1354–5 (1964).

In the last two decades the repressive restrictions [40] of a century ago

---

40. The same Court which had so narrowly construed the 14th Amendment by holding its inapplicability to private conspiracies; nevertheless read that the 14th Amendment gave states great latitude to segregate, separate, discriminate. Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896). As Professor Bell has stated in his perceptive article, Black Faith in a Racist Land, Journal of Public Law, 409, 414–415 (1971):

"And as the gains made by blacks—political, legal, and social—were erased in the 1870's, the Supreme Court and the lower courts confirmed in their decisions what blacks had feared, that the citizenship they had been granted, which indeed they believed they had earned through the blood of thousands of blacks who had died fighting on the Union side during the War, was citizenship in name only.

\* \* \* \* \*

" . . . it took faith to survive the latter portion of the Nineteenth Century as the Supreme Court ratified the de facto disenfranchisement of black people with a series of decisions that cut the heart out of both the Civil Rights Acts enacted in the 1860's and 1870's and the amendments on which they were based, culminating in the Plessy v. Ferguson doctrine of 'separate but equal' in 1896. At least the Court meant the 'separate' part of the standard, as indicated a few years later in Cumming v. Richmond County School Board [175 U.S. 528, 20 S.Ct. 197, 44 L.Ed. 262] when it termed ridiculous a suggestion that the school board's failure to provide a high school for black students should require the closing of the high school that was provided for whites."

While the deep damage in human values, dignity and injustice to blacks as a result of the *Plessy* decision can never be totally undone, at least in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), a start was made to get the 14th Amendment back to the rationale which Justice Harlan had asserted in his dissenting opinion in *Plessy*. Justice Harlan asserted:

"The destinies of the two races, in this country, are indissolubly linked together, and the interests of both require that

have been modified. On the basis of the current, and I believe more accurate, construction of the Fourteenth Amendment, I hold that Congress had the power under § 5 of the Fourteenth Amendment to reach purely private acts of racial discrimination, violative of 42 U.S.C. §§ 1981, 1985(2) and 1985(3).

During recent decades in the civil rights field where the power of legislatures and courts to prohibit racial discrimination and violence is challenged, the parameters of constitutional permissibility have been appropriately broadened beyond the restrictive constructions of early generations. Not merely have blacks been the beneficiaries of a more supportive constitutional doctrine, but other beneficiaries have been labor,[41] the aged,[42] the investor,[43] minors,[44] the poor,[45] the farmer,[46] the consumer,[47] and women.[48]

From my perspective, particularly in the race relations field, these recent holdings more accurately reflect the original intent of the framers of the post-civil war civil rights statutes and the constitutional amendments. A most perceptive scholar on this subject, Loren Miller, has written as to the goals set by the framers

the common government of all shall not permit the seeds of race hate to be planted under the sanction of law. What can more certainly arouse race hate, what more certainly create and perpetuate a feeling of distrust between these races, than state enactments which, in fact, proceed on the ground that colored citizens are so inferior and degraded that they cannot be allowed to sit in public coaches occupied by white citizens? That, as all will admit, is the real meaning of such legislation as was enacted in Louisiana.
"The sure guaranty of the peace and security of each race is the clear, distinct, unconditional recognition by our governments, national and state, of every right that inheres in civil freedom, and of the equality before the law of all citizens of the United States, without regard to race. State enactments regulating the enjoyment of civil rights upon the basis of race, and cunningly devised to defeat legitimate results of the war, under the pretense of recognizing equality of rights, can have no other result than to render permanent peace impossible, and to keep alive a conflict of races, the continuance of which must do harm to all concerned." 163 U.S. 537, 561, 16 S.Ct. 1138, 1147 (1896).

41. N.L.R.B. v. Allis-Chalmers Mfg. Co., 388 U.S. 175, 87 S.Ct. 2001, 18 L.Ed.2d 1123 (1967); United States v. Darby, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941); N.L.R.B. v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937).

42. Social Security Board v. Nierotko, 327 U.S. 358, 66 S.Ct. 637, 90 L.Ed. 718 (1946); Steward Machine Co. v. Davis, 301 U.S. 548, 57 S.Ct. 883, 81 L.Ed. 1279 (1937).

43. Mills v. Electric Auto-Lite Co., 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970); J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964); American Power and Light Co. v. S.E.C., 329 U.S. 90, 67 S.Ct. 133, 91 L.Ed. 103 (1946); North American Co. v. S.E.C., 327 U.S. 686, 66 S.Ct. 785, 90 L.Ed. 945 (1946).

44. In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967); Oregon v. Mitchell, 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970).

45. Argersinger v. Hamlin, 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972); Rosado v. Wyman, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970); Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968); Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963).

46. Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970); Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942); Mulford v. Smith, 307 U.S. 38, 59 S.Ct. 648, 83 L.Ed. 1092 (1939).

47. Swarb v. Lennox, 405 U.S. 191, 92 S.Ct. 767, 31 L.Ed.2d 138 (1972); Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); Sniadach v. Family Finance Corp., 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969).

48. Reed v. Reed, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971); Muller v. Oregon, 208 U.S. 412, 28 S.Ct. 324, 52 L.Ed. 551 (1908); Weeks v. So. Bell Tel. & Tel. Co., 408 F.2d 228 (5th Cir. 1969).

in their enactment of the early civil rights statutes and the 13th, 14th, and 15th amendments:

"The courts, it was believed, would be compelled to lend their process to enforcement without regard to their notions of policy. The long sickness had come to an end; now the majestic rhetoric of the Declaration of Independence had full meaning: 'All men are created equal [and] are endowed by the creator with certain inalienable rights, and among these are Life, Liberty and the pursuit of Happiness. The "Government . . . instituted among men" in the United States of America was committed to *"secure these rights" and to safeguard them against the aggression of individuals, of the states and of their agents and servants.* By constitutional fiat and statutory direction, the national writ would run to guarantee privileges and immunities, due process, and equal protection of the law for every man, white and black.' "[49] (emphasis added)

During the 1960's and 1970's we have been forced to inquire whether the common goals and demands of one hundred years ago have been implemented; thus, in Loren Miller's words have we been able to safeguard these rights "against the aggression of individuals, of the states, and of their agents and servants?"[50]

### B. *The "Newly Awakened Power"[51] of The Fourteenth Amendment.*

In Katzenbach v. Morgan, 384 U.S. 641, 651, 86 S.Ct. 1717, 1723–1724, 16 L.Ed.2d 828 (1966), the Supreme Court, in upholding § 4(e) of the Voting Rights Act of 1965, 42 U.S.C. § 1973b(e), held:

"Correctly viewed, § 5 [of the Fourteenth Amendment] is a positive grant of legislative power authorizing Congress to exercise its discretion in determining whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment."

Thus, the Court opened the door to Congress to use its "newly awakened power."[51A] In one case, there was no need for Congress to use its power prospectively; for the Supreme Court, earlier in the 1966 Term, had before it United States v. Guest, 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966). The *Guest* case involved the sufficiency of a criminal indictment under 18 U.S.C. § 241.[52]

Mr. Justice Brennan, writing for himself and then Chief Justice Warren and

---

49. L. Miller, The Petitioners, The Story of the Supreme Court of the United States and the Negro, 100–101 (1966).

50. *Id.* at 101.

51. Frantz, Federal Power to Protect Civil Rights: The Price and Guest Cases, 4 Law in Transition Quarterly 63, 71 (1967).

51A. *Id.*

52. 18 U.S.C. § 241 is derived from § 6 of the Enforcement of 1870, 16 Stat. 140. United States v. Price, 383 U.S. 787, 803, 86 S.Ct. 1152, 1161, 16 L.Ed.2d 267 (1966). § 6 originally provided:

"*And be it further enacted,* That if two or more persons shall band or conspire together, or go in disguise upon the public highway, or upon the premises of another, with intent to violate any provision of this act, or to injure, oppress, threaten, or intimidate any citizen with intent to prevent or hinder his free exercise and enjoyment of any right or privilege granted or secured to him by the Constitution or laws of the United States, or because of his having exercised the same, such persons shall be held guilty of felony, and, on conviction thereof, shall be fined or imprisoned, or both, at the discretion of the court.—the fine not to exceed five thousand dollars, and the imprisonment not to exceed ten years,—and shall, moreover, be thereafter ineligible to, and disabled from holding, any office or place of honor, profit, or trust created by the Constitution or laws of the United States."

18 U.S.C. § 241 is "the closest remaining criminal analogue to [42 U.S.C.] § 1985(3)." Griffin v. Breckenridge, 403 U.S. 88, 98, 91 S.Ct. 1790, 1796, 29 L.Ed.2d 338 (1971).

Justice Douglas, and referring to Justice Clark's concurring Opinion, stated:

"*A majority of the members of the Court expresses the view today that § 5 empowers Congress to enact laws punishing all conspiracies to interfere with the exercise of Fourteenth Amendment rights, whether or not state officers or others acting under the color of state law are implicated in the conspiracy.* Although the Fourteenth Amendment itself, according to established doctrine 'speaks to the state or those acting, under the color of its authority,' legislation protecting rights created by that Amendment, such as the right to equal utilization of state facilities, need not be confined to punishing conspiracies in which state officers participate. Rather, § 5 authorizes Congress to make laws that it concludes are reasonably necessary to protect a right created by and arising under that Amendment; and Congress is thus fully empowered to determine that punishment of private conspiracies interfering with the exercise of such a right is necessary to its full protection. . . . I acknowledge that some of the decisions of this court, most notably an aspect of the Civil Rights Cases, 109 U.S. 3, 11, 3 S.Ct. 18, 21, 27 L.Ed. 835 have declared that Congress' power under § 5 is confined to the adoption of 'appropriate legislation for correcting the effects of . . . prohibited state law and state acts, and thus to render them effectually, null, void, and innocuous.' I do not accept—and a majority of the Court today rejects—this interpretation of § 5. . . .

"Viewed in its proper prospectus, § 5 of the Fourteenth Amendment appears as a positive grant of legislative power, authorizing Congress to exercise its discretion in fashioning remedies to achieve civil and political equality for all citizens. . . ." 383 U.S. at 782–784, 86 S.Ct. 1191–1192. (Footnote omitted.) (Emphasis added.)

 I conclude on the basis of *Guest, supra,* that Congress can reach purely private conspiracies under § 5 of the Fourteenth Amendment. The remaining question is whether § 1981, § 1985(2) and § 1985(3) are an appropriate exercise of congressional power if construed as enacted pursuant to § 5 of the Fourteenth Amendment.[53] This is the precise question left open by the Supreme Court in Griffin v. Breckenridge, *supra,* where the Court noted:

"In identifying these two constitutional sources of Congressional power [Interstate Commerce Clause and Thirteenth Amendment], we do not imply the absence of any other. More specifically, the allegations of the complaint in this case have not required consideration of the scope of power of Congress under § 5 of the Fourteenth Amendment." (Footnote omitted.) [54]

Research indicates that only one Court of Appeals considered the constitutional application of 42 U.S.C. § 1985(3) where the source of Congressional power was alleged to be § 5 of the Fourteenth Amendment. In Action v. Gannon, 450 F.2d 1227 (8th Cir. 1971), the Court expressly held that § 1985(3) was a constitutionally sound and permissible exercise of Congress' power to enforce § 5 of the Fourteenth Amendment.[55] Further, that Court carefully reviewed United States v. Guest, *supra,* and the relevant literature concerning the scope of the Fourteenth Amendment,[56] and relied primarily on H. Flack, The Adoption of

---

53. *See discussion, infra,* p. 297 for Congress' power to enact these statutes under the Thirteenth Amendment.

54. 403 U.S. at 107, 91 S.Ct. at 1801 (1971).

55. While the *Action* Court only considered 42 U.S.C. § 1985(3), my view of the stat-

utory history of § 2 of the Civil Rights Act of 1871, supra, indicates that the constitutionality of either §§ 1985(2) or 1985(3) poses an identical question.

56. 450 F.2d at 1236–1237, nn. 13, 14, 15.

the Fourteenth Amendment, at 277 (1908) who stated:

". . . [A]ccording to the purpose and intention of the Amendment as disclosed in the debates in Congress and in the several state Legislatures and in other ways, Congress had the constitutional power to enact direct legislation to secure the rights of citizens against violations by individuals as well as by the States."[57]

The Court then concludes:

"This [Flack's] interpretation of the Amendment would leave to Congress the question of the extent to which it desired to exercise its power under the Amendment subject, of course, to the limitation previously expressed in this opinion that it can only exercise its power with respect to rights protected by the Fourteenth Amendment. . . ."[58]

Of course, I must note, I too, have followed the limitation of the Eighth Circuit; for I have concluded, *supra,* that one of the important privileges and immunities of United States Citizenship secured by the Fourteenth Amendment against both public and private interference is the right to unlimited and unimpaired access to the Federal Courts. Accordingly, for all the above reasons, I hold that 42 U.S.C. §§ 1981, 1985(2) and 1985(3) are constitutional exercises of Congress' power under § 5 of the Fourteenth Amendment.

C. *The Newly Awakened Thirteenth Amendment.*

In addition to my holding that 42 U.S.C. §§ 1981, 1985(2) and 1985(3) can be constitutionally utilized to reach the private conduct of the defendants under Congress' power to enforce § 5 of the Fourteenth Amendment, I alternatively hold that these statutes,—42 U.S.C. §§ 1981, 1985(2) and 1985(3)—can be sustained as an appropriate exercise of Congressional power under § 2 of the Thirteenth Amendment which provides:

"Congress shall have power to enforce this article by appropriate legislation."

The Thirteenth Amendment in § 1 provides:

"Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction."[59]

The Supreme Court in Jones v. Alfred H. Mayer Co., supra, in discussing Congressional power to enact legislation pursuant to § 2 of the Thirteenth Amendment, stated:

"Surely Congress has the power under the Thirteenth Amendment rationally to determine what are the *badges and incidents of slavery,* and the authority to translate that determination into effective legislation." 392 U.S. at 440, 88 S.Ct. at 2203–2204. (emphasis added)

It should be reiterated that in *Jones, supra,* the Supreme Court expressly upheld Congress' power to enact 42 U.S.C. § 1982 under the Thirteenth Amendment. Further, in view of my finding, *supra,* that both 42 U.S.C. §§ 1981 and 1982 were originally derived from § 1 of the Civil Rights Act of 1866 (14 Stat. 27), the Supreme Court's upholding of

---

57. 450 F.2d at 1237.

58. Action v. Gannon, *supra,* 450 F.2d at 1337 (8th Cir. 1971).

59. For an analysis of the Thirteenth Amendment *See generally* Emerson, Haber, Dorsen, Political and Civil Rights in the United States, II 1004–1009 (1967); TenBroek, 13th Amendment to the Constitution of the United States, 39 Calif. L.Rev. 171 (1951); Hamilton, The Legislative and Judicial History of the 13th Amendment, 9 National B.J. 26 (1951);

10 *id.* 7 (1952); Hale, Some Basic Constitutional Rights of Economic Significance, 51 Colum.L.Rev. 271, 272–278 (1951); Konvitz and Leskes, A Century of Civil Rights, 3–37 (1961); Franklin, Civil Rights in the U. S.: A Chapter in the Emancipation of the Negro, 1863–1962 (1962); Woodson and Wesley, The Negro in Our History (1962); The "New" Thirteenth Amendment: A Preliminary Analysis, 82 Harv.L.Rev. 1294 (1969).

§ 1982 [60] must similarly sanction the constitutionality of § 1981. But even if the Supreme Court's Opinion in *Jones* cannot be so read, I expressly hold that the rights protected by § 1981,—". . . to sue, be parties, [and] give evidence . . ." are as fundamental as the property rights protected and sustained under § 1982. In fact, in *Jones* itself, the Court notes:

"The Thirteenth Amendment authorizes Congress not only to outlaw all forms of Slavery and involuntary servitude but also to *eradicate the last vestiges and incidents of a society half slave and half free,* by securing to all citizens, of every race and color, 'the same right to make and enforce contracts, to sue, be parties, give evidence, and to inherit, purchase, lease, sell and convey property, as is enjoyed by white citizens'." (emphasis added) [61]

Thus, Congress has provided in § 1981 a remedy which has an additional constitutional basis under § 2 of the Thirteenth Amendment for private acts which abridge the fundamental rights of all free men,—the rights "to sue, be parties, [and] give evidence, . . ." freely and without violence or intimidation.

In Griffin v. Breckenridge, supra, the Court considered the constitutionality under the Thirteenth Amendment of 42 U.S.C., § 1985(3) as it applied to the private conspiracy there alleged. I have previously held that both 42 U.S.C. §§ 1985(2) and 1985(3) were both derived from § 2 of the Civil Rights Act of 1871 (17 Stat. 13). Thus, when the Supreme Court stated the following in *Griffin, supra,* 403 U.S. at 105, 91 S.Ct. at 1800, the words were applicable equally to §§ 1985(2) and 1985(3):

"Not only may Congress impose such liability, but the varieties of private conduct that it may make criminally

punishable or civilly remediable *extend far beyond the actual imposition of slavery or involuntary servitude.* By the Thirteenth Amendment, we committed ourselves as a Nation to the proposition that the former slaves and their descendants should be forever free . . . We can only conclude that Congress was wholly within its powers under § 2 of the Thirteenth Amendment in creating a statutory cause of action for Negro citizens who have been the victims of conspiratorial, racially discriminatory private action aimed at depriving them of the *basic rights that the law secures to all free men.*" (emphasis added)

Thus the Supreme Court expressly concluded that 42 U.S.C. § 1985(3) and the rights it protects has constitutional validity under the shield of the Thirteenth Amendment.

Even if one were to reject the argument that §§ 1985(2) and 1985(3) were both derived from § 2 of the Civil Rights Act of 1871 and that the constitutionality of one is dispositive of the constitutionality of the other, there is ample basis to independently sustain 1985(2). Section 1985(2) by its own terms provides a damage remedy for conspiracy ". . . to deter by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, . . ."

■ It cannot be questioned that these protections are tied inextricably to those rights "to sue, be parties, [and] give evidence" protected by § 1981 and thus inferentially sustained by the Supreme Court in *Jones, supra.* Further, there is no doubt that the acts of violence perpetrated on the plaintiffs here had the requisite ". . . class-based, invidiously discriminatory animus

---

60. I have found *supra* that to the extent § 1981 was also derived from § 16 of the Civil Rights Act of 1870 (16 Stat. 140), the re-enactment in 1870 in no way limited either the scope or applicability of the statute.

61. Jones, supra, 392 U.S. at 440 n. 78, 88 S.Ct. at 2204 n. 78.

. . ." *Griffin, supra,* 403 U.S. at 102, 91 S.Ct. at 1798. Thus, § 1985(2), like its partner, § 1985(3), can be sustained as an exercise of Congress' power to determine what are the "badges and incidents of slavery" and "to translate that determination into effective legislation." *Jones, supra.*

D. *The "Badges and Incidents" of Slavery.*

Those who are not students of American racial history, might ask: "What does the beating of black litigants in this case have to do with the 'badges and incidents' of slavery? How can the attitudes of defendants be related to the institution of slavery which was eradicated more than 100 years ago?" The answer is that these racist acts are as related to the incidents of slavery as each roar of the ocean is related to each incoming wave. *For slavery was an institution which was sanctioned, sustained, encouraged and perpetuated by federal constitutional doctrine. Today's conditions on race relations are a sequelae and consequence of the pathology created by this nation's two and a half centuries of slavery.* As Chief Justice Taney said in 1856, the black man:

" . . . had no rights which the white man was bound to respect; the Negro might justly and lawfully be reduced to slavery for his [the master's] benefit, he was bought and sold as an ordinary article of merchandise and traffic whenever a profit could be made by it. This opinion was at that time fixed and universal in the civilized portion of the white race. It was regarded as an axiom in morals as well as politics which no one thought of disputing or supposed to be open to dispute; and men in every great position in society daily and habitually acted upon it in their private pursuits, as well as in matters of public concern without doubting for a moment the correctness of this opinion".[62]

Though he stated that "this opinion was at that time fixed and universal in the civilized portion of the white race," Chief Justice Taney was amazingly incorrect on both his history of slavery and his jurisprudence.[63] For despite Chief Justice Taney's assertion, slavery had been repudiated within England prior to our Declaration of Independence and prior to the adoption of the United States Constitution through Lord Mansfield's significant opinion in 1772 in Somerset v. Stewart.[64] Regardless of its historical inaccuracy, *Dred Scott* announced a constitutional principle that a badge and incident of slavery was that black men (whether they were slaves or not) ". . . had no rights which the white man was bound to respect". By "no rights" the federal constitutional perception meant no rights in the federal court,[65] no rights to equally compete in the labor market,[66] no rights to liberty,

62. Dred Scott v. Sandford, 60 U.S. (19 How) 343, 407, 15 L.Ed. 691.

63. For evidence indicating that at least this view was not "universal in the civilized portion of the white race", see Somerset, infra, at M. 64; Tannenbaum, *Slave and Citizen* (1946); Woodson, *The Negro in Our History* (8th Edition) 101.

64. Kings Bench, 12 George III, AD 1771–72.

65. Dred Scott v. Sandford, supra.

66. "The plantation system, with its abundance of slave labor, had little need for agricultural wage-earners. When whites were employed by the large planters, they were used to do hazardous jobs which exposed the workers to sickness, injury, or death. The plantation owners soon captured most of the desirable land as well as a large segment of the market for cotton. And as time went on, Negro slaves obtained the majority of the domestic service jobs in the towns and cities of the South and captured an ever-growing proportion of the skilled work. The poor white wage-earner was pushed out in this economy; he found little work; he was insecure; he developed deep animosity toward the plantation system. This animosity was not always directed against the institution of slavery, for the injection of color concepts and the rationalization and defense of slavery on the basis on imputed

no rights to equality, no rights to justice, no rights to manhood,[67] and black slave women not even having the right to possess their own children.[68]

racial characteristics of inferiority often prevented such results. It encouraged many of the propertyless whites to identify themselves with the master classes and find compensation for their insecurity in the support of a racial and economic system which relegated the Negro to a permanent sub-human status. The poor whites' hatred for the plantation system was transferred to a hatred for their fellow victims of it—the Negro slaves.

This animosity was inevitable once a concept of status based on race and color was introduced. It was extremely useful for those who benefited from slavery because it confused an economic issue with a racial one. That confusion has persisted and is still basic to any discussion of the economic status of colored minorities in America.

\* \* \*

"Slavery has long been abolished, . . . In the place of slavery we have substituted a color occupational system. That system perpetuates the concept of the Negro as an inferior being and establishes institutions to assure his inferior status. It serves to conceal the basic nature of economic problems and covers them with color situations". R. Weaver, *Negro Labor: A National Problem*, pp. 3 & 4 (1946).

67. In State v. Mann, 13 N.Car. 263, 265–266 (1829), Mr. Justice Ruffin articulated the rule of law which denied to slaves any dignity or basic human rights:

"There is an impassable gulf between them. The difference is that which exists between freedom and slavery—and a greater cannot be imagined . . . With slavery . . . the end is the profit of the master, his security, and the public safety; the subject, one doomed in his own person and his posterity, to live without knowledge and without the capacity to make anything his own, and to toil that another may reap the fruits."

In reply to some members who had proposed abolition of slavery, Mr. Gholson of the Virginia Legislature said in 1831, "Why I really have been under the impression that I owned my slaves. I lately purchased *four women* and ten children in whom I thought I obtained a great bargain, for I really supposed they were *my property*, as were my *brood mares*." In the United States House of Representatives one Congressman said, "slaves have no more right to be heard than horses and dogs." On February 11, 1837, the House of Representatives of the United States resolved, by a vote of 162 to 18, "that slaves do not possess the right of petition secured to the people of the United States by the Constitution."

The daughter of Judge Grimkey of the Supreme Court of South Carolina, said "Slaveholders regard their slaves *as property*, the mere instruments of their convenience and pleasure. One who is a slaveholder at heart, *never recognizes a human being in a slave*." W. Goodell, The American Slave Code in Theory and Practice, pp. 53–54 (1853).

See, also, Helen Catterall's superb study—Judicial Cases Concerning American Slavery and the Negro, V. I–V (1926), and G. M. Stroud, A Sketch of the Laws Relating to Slavery, 2d Ed., (1856).

68. An advertisement in Hamburg, South Carolina, on September 28, 1838, noted:

" . . . The subscriber has just arrived from Petersburg, Virginia, with one hundred and twenty likely young Negroes of both sexes and every description, which he offers for sale on the most reasonable terms. The lot now on hand consists of plough-boys, several likely and well-qualified house servants of both sexes, several women and children, small girls suitable for nurses, and *several small boys without their mothers*. Planters and traders are earnestly requested to give the subscriber a call previously to making purchases elsewhere, as, he is enabled to sell as cheap or cheaper than can be sold by any other person in the trade.

Benjamin Davis"

"Hamburg, S.C., September 28, 1838"

The advertisement of Benjamin Davis in 1838 was not unique, it was typical of thousands of advertisements posted in newspapers and bulletin boards throughout our land. In the *New Orleans Bee* an advertisement noted:

"Negroes for sale—A Negro woman, 24 years of age, and her two children, one eight and the other three years old. *Said Negros will be sold separately or together as desired.* The woman is a good seamstress. She will be sold low for cash, or exchanged for groceries. For terms apply to Matthew Bliss and Company, 1 Front Levee". (W. Goodell *id.* at 54–5). (Emphasis added.)

Thus, under the rule of law, doctrines were sanctioned which permitted the sale of several small boys without their mothers and a mother 24 years of age to be

The purpose of the Thirteenth Amendment was not merely abolishing the physical cruelties of slavery, but its purpose was to also eradicate those "badges and incidents of slavery." [69] The Thirteenth Amendment ". . . authorizes Congress not only to outlaw all forms of slavery and involuntary servitude, but also to eradicate the last vestiges and incidents of a society half slave and half free. . . ." Surely, if in *Jones, supra,* Congress, through the Thirteenth Amendment can assure equal access to housing, here it can assure equal access to the Courts and ban discrimination in employment. For the denial of equal housing opportunities in *Jones, supra,* was no more a vestige and incident of slavery than the racially invidious discriminatory animus aimed at black plaintiffs in this case.

Finally, having determined that §§ 1981, 1985(2) and 1985(3) all find additional support under the Thirteenth Amendment, there no longer can be any constitutional question raised by the fact that the statutes reach ". . . beyond state action to regulate the conduct of private individuals." *Jones, supra,* 392 U.S. at 439, 8 S.Ct. at 2203. For in *Griffin, supra,* 403 U.S. at 105, 91 S.Ct. at 1799–1800, the Supreme Court stated:

> "Surely there has never been any doubt of the power of Congress to impose liability on private persons under § 2 of that [Thirteenth] amendment. . . ."

Accordingly, for all the above reasons, I hold that 42 U.S.C. §§ 1981, 1985(2) and 1985(3) are constitutional under the Thirteenth Amendment as applied to the purely private acts proven in the instant case.

## VIII

### REMEDY

In addition to seeking an injunction, plaintiffs request the Court to order defendants to post a $100,000 bond. I am concerned about the violation of named and class plaintiffs' federal statutory and constitutional rights. However, at this point I will not now require a bond to be posted; but if the injunction is violated, I will consider immediately an application for the posting of a bond and any other appropriate relief.

In Action v. Gannon, 450 F.2d 1227 (8th Cir. 1971), the Court of Appeals affirmed the District Court's issuance of an injunction under 42 U.S.C. § 1985 (3) employing the broad powers of the federal courts to fashion remedies under the Civil Rights Acts. See e. g. Bell v. Hood, 327 U.S. 678, 684, 66 S.Ct. 773, 90 L.Ed. 939 (1946).

Further in Mizell v. North Broward Hospital District, 427 F.2d 468, 473 (5th Cir. 1970) the Court there reasoned that injunctive relief is an appropriate remedy to vindicate § 1985(3) rights. The Court in an opinion by Judge Tuttle concluded that § 1985(3) permitted injunctive relief, stating:

> ". . . [The District Court's] statement [that § 1985(3) provides only for damages] . . . seems clearly to express [its] view that it would be powerless to enter an injunction in the event the plaintiff's proof showed he was otherwise entitled to it. We think that the Supreme Court's decision in Jones v. [Alfred H.] Mayer Co., [392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189] also resolved this issue. As we have pointed out above, Section 1982, which was before the court for consideration, gave no authority for the granting of an injunction or the granting of damages. Nevertheless the court held that both powers would be available to a court upon proof of facts bringing the plaintiff within the terms of the Civil Rights Act there involved. We think the same power is available to a trial

sold in exchange for groceries and to be separated from her eight and three year old children.

69. Jones v. Alfred H. Mayer, Co., 392 U.S. at 440, 88 S.Ct. at 2203.

court in an action brought under Section 1985, even though that section refers in precise terms only to a suit for damages. As the court said [in *Jones*], 'The fact that 42 U.S.C. § 1982 is couched in declaratory terms and provides no explicit method of enforcement does not, of course, prevent a federal court from fashioning an effective equitable remedy . . .' "

Finally, in Brewer v. Hoxie School District No. 46, 238 F.2d 91, 98 (8th Cir. 1956) the Court sustained an injunction under § 1985(3).

During the last four decades the rights of labor and the power of the labor movement have been appropriately broadened beyond the restrictive parameters of earlier generations.[70] By the laws and the Constitution of the United States the defendant union is not permitted to be a divisive and coercive force to retard blacks from also seeking an open society with the equal rights of other men.

The purposes of the early civil rights statutes and the Thirteenth, Fourteenth and Fifteenth Amendments to the Constitution were to make real to blacks the earlier "self evident truths" uttered in the Declaration of Independence.[71] In the 1860's and early 1870's, Congress made indubitably clear its intent to eradicate racial injustice from the American scene.[72] It is now too late in the corridors of history for a court to sanction defendant-labor union's attempt to turn back the swelling tides for that equal racial justice which the federal law demands.

## ORDER

The attached Opinion constitutes my findings of facts pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, and conclusions of law.

From the competent evidence presented at the hearings held before this Court on June 20–22, 1972, I find that an injunction, *pendente lite*, should issue because there is a reasonable certainty that the Local Union 542, its officers, agents, members, and others acting on its behalf or in concert with the foregoing will continue to threaten, harass, intimidate, assault, and otherwise interfere with the named and class plaintiffs' federal statutory and Constitutional rights to be free from retaliation because of their instituting and processing the instant employment discrimination lawsuit. I further find that unless the defendant, Local 542, its officers, agents, members and others acting on its behalf or in concert with the foregoing are so restrained and enjoined the named and class plaintiffs will suffer immediate and irreparable injuries.

And now, this 4th day of August, 1972, it is hereby ordered that the defendant, Local Union 542, its officers, agents, members, and others acting on its behalf or in concert with the foregoing are hereby enjoined and restrained, *pendente lite*, from at any place (whether on job sites, the union hall, public streets, or anywhere else) doing each and all of the following:

1. Threatening, intimidating, harassing, assaulting, injuring, or otherwise interfering in any manner with the named and class plaintiffs' federal statutory and Constitutional rights to be free from retaliation because of their instituting and processing the instant employment discrimination lawsuit; and

2. Doing any and all other acts which in any manner interfere with named and

---

70. *See* n. 41, *supra*. *See also* D. Bok & J. Dunlop, *Labor and the American Community* (1970).

71. *See* n. 1 and p. 291, *supra*.

72. As an example through the Civil Rights Act of 1866, Congress said " . . . that all persons born in the United States . . . are hereby declared to be citizens of the United States; and such citizens of every race and color, without regard to any previous condition of servitude or involuntary servitude . . . shall have the same right in every State and Territory in the United States . . . *to full and equal benefit of all laws* and proceedings for the security of persons and property, *as is enjoyed by white citizens* . . . " (Emphasis added.) (*See* p. 287 *supra*.)

class plaintiffs' federal statutory and Constitutional rights to institute and process the instant employment discrimination lawsuit.

3. This injunction is in full force and effect from the date of this Order.

4. It is further ordered that federal marshals shall be available to enforce this order.